**UNITED STATES of America, et al., Plaintiffs,**

**v.**

**State of WASHINGTON, et al., Defendants.**

**Civil No. 9213.**

United States District Court, W.D. Washington, at Seattle.

COMPILATION OF MAJOR POST–TRIAL SUBSTANTIVE ORDERS (January 1, 2000 through December 31, 2003)

See appellate decisions, 394 F.3d 1152, 593 F.3d 790.

COMPILATION OF MAJOR POST-
TRIAL SUBSTANTIVE ORDERS
(Through December 31, 2003)
STIPULATION AND ORDER RE:
FRASER RIVER SOCKEYE
SALMON

(February 11, 2000)

BARBARA JACOBS ROTHSTEIN,
District Judge.

## TABLE OF CONTENTS

ORDER PAGE

Stipulation and Order re: Fraser River Sockeye Salmon (2/11/2000) 1323

Order Denying Private Land Owners' Motion for Reconsideration and
Granting–in–Part and Denying–in–Part Private Land Owner's Motion for
Amendment of the Court's Clarifying Order (2/25/2000) 1330

Consent Decree (8/18/2000) 1331

Memorandum of Understanding Re: Coastal Coho Management (8/31/2000) See Appendix

Order Establishing Interim Halibut Fishery Management Plan (3/20/01) 1332

Order on Summary Judgment Motions (4/5/01), 143 F.S.2d 1218 See Appendix

Proposed Order re Amendment to Paragraph G of Order for Program to
Implement Interim Plan (5/8/01) 1335

Order Granting United States' and Denying Washington's Motions for
Judgment (9/6/01) 1336

Order Granting United States' Motion for Reconsideration and Motion to
Dismiss State's Cross–Request for Determination (10/26/01) 1340

Minute Entry: In Chambers Proceedings (3/18/02) 1343

Stipulation and Order Amending Shellfish Implementation Plan (4/8/02) 1344

Order Denying the Samish Tribe's Motion to Reopen Judgment (12/19/02) 1369

Order Denying the Samish Tribe's Motion for Reconsideration (2/7/03) 1377

Order Denying Emergency Motion for Continued Maintenance of Status Quo
and for 2003 Management Plan (2/26/03) 1379

Order Denying Motion to Strike (3/13/03) 1381

Order Denying the State of Washington's Motion for a Preliminary Injunction
(4/2/03) 1382

Order on Motion for a Temporary Restraining Order (10/10/03) 1384

Order on Motion for Reconsideration (11/24/03) 1384

## STIPULATION

The parties to this Stipulation agree to the arrangements herein set forth to facilitate adoption of a new Annex to the Pacific Salmon Treaty between the United States and Canada. This Stipulation and Order is entered into under the authority of Paragraph 14 of the court's March 22, 1974 permanent injunction in *United States v.* *Washington,* 384 F.Supp. 312, 416–17 (W.D.Wash.1974) (Dkt. # 508).

### I. PARTIES AND DEFINITIONS

1. The parties to this Stipulation are:

The Jamestown S'Klallam Tribe

The Lower Elwha S'Klallam Tribe

The Lummi Nation

The Makah Indian Tribe

The Nooksack Indian Tribe

The Port Gamble S'Klallam Indian Tribe

The Suquamish Indian Tribe

The Swinomish Indian Tribal Community

The Tulalip Tribes

The United States of America

The State of Washington

2. A. As used herein, the term "1999 Annex" means the version of Annex IV to the Pacific Salmon Treaty that the parties to that Treaty adopted by exchange of diplomatic notes dated June 30, 1999.

B. As used herein, the term "Tribes" means those Tribes signing this Stipulation and Order.

## II. AGREED STATEMENTS

1. Under equitable orders entered in *United States v. Washington* and in *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), the treaty Tribes party to *United States v. Washington* and the State of Washington are entitled to an opportunity to take up to 50% of the salmon available for harvest within Washington and closely adjacent marine waters, from runs that pass through tribal usual and accustomed fishing grounds. These salmon include sockeye that spawn in the Fraser River system in Canada and many chinook, coho, and chum stocks that originate in Washington waters.

2. On January 28, 1985, the United States and Canada entered into the Pacific Salmon Treaty, T.I.A.S. No. 11091. The United States Senate ratified the treaty on March 7, 1985. The Pacific Salmon Treaty addresses the conservation and international allocation of salmon stocks that originate in one country and are subject to interception in the other. Stocks subject to the Pacific Salmon Treaty include sockeye and pink from the Fraser River and many chinook, coho, and chum stocks that originate in Washington. Article IV of the Pacific Salmon Treaty contemplates that the two countries will negotiate fishing regimes, which are attached to the Treaty as annexes and implemented through regulations adopted in the member countries Annex IV is concerned with fishing regimes adopted by the United States and Canada. Chapter 4 of Annex IV addresses Fraser River sockeye salmon.

3. Since the Pacific Salmon Treaty was executed, a number of chinook, chum, and coho stocks that originate in or migrate through Washington and that are subject to the Pacific Salmon Treaty have been listed as threatened or endangered under the Endangered Species Act. These include Puget Sound Chinook—threatened (64 Fed.Reg. 14308, 14319 (March 24, 1999)), Lower Columbia River Chinook—threatened (*Id.* at 14321), Upper Columbia River Spring Chinook—endangered (*Id.* at 14324), Upper Willamette River Chinook—threatened (*Id.* at 14323), Snake River Spring and Summer Chinook—threatened (57 Fed.Reg. 14653, 14661 (April 22, 1992)), Snake River Fall Chinook—threatened (*Id.* at 14661), Hood Canal Summer Run Chum—threatened (64 Fed.Reg. 14508, 14513 (March 25, 1999)), Oregon Coastal Coho—threatened (63 Fed.Reg. 42587 (Aug. 10, 1998)), and Ozette Lake sockeye—threatened (64 Fed.Reg. 14528, 14533 (March 25, 1999)). Puget Sound Coho and Lower Columbia River Coho salmon, which are also subject to the Pacific Salmon Treaty, are candidates for listing under the Endangered Species Act. 60 Fed.Reg. 38011, 38022, 38024 (July 25, 1995). All residents of Washington State have an interest in the conservation and recovery of these fish.

4. During the first four years of the Pacific Salmon Treaty, the United States'

share of the Fraser River sockeye harvest opportunity was approximately 26%, the Canadian share 74%. Canada has sought to increase the Canadian share of the harvest. Disagreement over the international sharing of Fraser River sockeye has been one obstacle to the negotiation of new Annexes to the Pacific Salmon Treaty.

5. In 1999, representatives of the United States and Canada have reached agreement on a multi-year Annex to the Pacific Salmon Treaty. Chapter 4 of the 1999 Annex addresses Fraser River salmon and is intended to remain in effect for twelve years. In the 1999 Annex, the United States has agreed to reduce its harvest of Fraser River sockeye salmon. Canada has agreed to conservation-based management regimes for harvest of salmon that originate in Washington, including salmon that have been listed or are candidates for listing under the Endangered Species Act. These arrangements are an integral part of the overall package of agreements in the 1999 Annex.

6. The State of Washington recognizes that the treaty Tribes in *United States v. Washington* may engage in treaty fishing only at usual and accustomed grounds and stations. Fraser River sockeye pass through the usual and accustomed grounds and stations of only some of the Tribes party to *United States v. Washington,* Because of that, some Tribes depend on Fraser River sockeye, while other Tribes do not. The Tribes that would suffer a reduction in sockeye opportunity are not necessarily the Tribes that might eventually benefit from increased abundance of other salmon species as contemplated in the 1999 Annex.

### III. ACTIONS TO BE TAKEN BY THE PARTIES

1. Under Article VI of the Pacific Salmon Treaty, the Fraser River Panel develops regulations for the harvest of sockeye and pink salmon within the Fraser Panel Area described in Annex II of the Treaty. The Fraser Panel Area generally includes U.S. and Canadian waters within the Strait of Juan de Fuca, northern Puget Sound, and the southern Strait of Georgia. Each year, the Fraser River Panel determines a Total Allowable Catch (TAC) of sockeye salmon. The 1999 Annex defines the TAC as the remaining portion of the annual aggregate Fraser River sockeye runs after deduction of spawning escapements, the Fraser River Aboriginal Exemption, and catches in test fisheries authorized by the Fraser River Panel.

2. In 1999, the overall U.S. catch in the Fraser Panel Area shall not exceed 22.4% of the TAC, of which 50% shall be made available for harvest by the Tribes, and 50% shall be made available for harvest by the State of Washington.

3. In 2000, the Washington non-treaty fisheries shall be reduced so that the U.S. catch in the Fraser Panel Area shall not exceed 20.4% of the TAC, of which 54.9% shall be made available for harvest by the Tribes, and 45.1% shall be made available for harvest by the State of Washington.

4. In 2001, the Washington non-treaty fisheries shall be further reduced so that the U.S catch in the Fraser Panel Area shall not exceed 18.4% of the TAC, of which 61% shall be made available for harvest by the Tribes, and 39% shall be made available for harvest by the State of Washington.

5. In 2002, the Washington non-treaty fisheries shall be further reduced so that the U.S. catch in the Fraser Panel Area shall not exceed 16.5% of the TAC, of which 67.7% shall be made available for harvest by the Tribes, and 32.3% shall be

made available for harvest by the State of Washington.

6. Each year from 2003 through 2010, the U.S. catch in the Fraser Panel Area shall not exceed 16.5% of the TAC, of which 67.7% shall be made available for harvest by the Tribes, and 32.3% shall be made available for harvest by the State of Washington.

7. The parties recognize that the unequal distribution of harvest reductions between treaty and non-treaty fisheries may cause hardship to the non-treaty fleet. The negotiators of the 1999 Annex have proposed that the United States Congress and the Washington State Legislature appropriate at least 30 million dollars (Congress 25–30 million and the Legislature up to 5 million) over several years to purchase and retire Washington non-treaty commercial fishery licenses so as to mitigate economic hardship to the non-treaty fleet. The parties anticipate that this buyback will be accomplished over a three-year period beginning in the fall of 1999.

8. Once any portion of the funds for the purchase and retirement of commercial fishing licenses issued by Washington has been appropriated in FY 2000 as described in Paragraph III.7, the reductions in allocations to State harvests described in Paragraphs III.3 through III.6 shall be made. This Stipulation and Order shall become null and void unless some portion of the funds described in Paragraph III.7 above is appropriated in FY 2000 and the license buyback program described above is commenced. Any party to this Stipulation may invoke this paragraph by providing evidence to all other parties of the failure of the above-referenced condition and by moving the court for an order declaring this Stipulation and Order to be null and void. Should this Stipulation become null and void, the 50–50 treaty/non-treaty sharing provisions under the equita-ble orders described in Paragraph II.1 above shall govern the treaty/non-treaty allocation of the U.S. share of sockeye salmon within the Fraser Panel Area.

9. The parties to this Stipulation agree that impacts on chinook, coho, and summer chum in Fraser Panel fisheries will continue to be considered in the North of Cape Falcon process, within the U.S. Section of the Fraser River Panel, and in other appropriate fishery management forums.

IV. EXPECTED BENEFITS

It is in the greater interests of all of the citizens of the State of Washington that a new Pacific Salmon Treaty Annex be adopted in which Canada pledges to reduce its interceptions of Washington salmon stocks listed under the Endangered Species Act (ESA), including those described in Paragraph II.3 above. Reduced interceptions in Canada and Alaska will increase the likelihood that endangered and threatened species will recover to the point that they no longer qualify for listing and harvestable numbers of fish will once again be available to the Tribes and the State. This will significantly reduce the overall economic impact of the listings on the Tribes and the State. The current listings will likely affect urban water supplies, agricultural lands, forestry, transportation facilities, the tourist industry, and the overall wealth of the State. The reduction of the State's share of sockeye salmon as recited in the 1999 Annex will return more threatened and endangered chinook and chum salmon and candidate coho salmon, which has major value to the State and the Tribes because it may help to reduce the duration and scope of federal ESA constraints within the State.

V. IMPLEMENTATION AND MODIFICATION

1. This Stipulation shall be effective when the following three conditions are met:

A. The 1999 Annex is adopted by the United States and Canada.

B. Any funds are appropriated as referred to in Paragraphs III.7 and III.8 to mitigate economic hardship to the non-treaty fleet.

C. This Stipulation is approved by the Court and entered as a Court Order, pursuant to the Court's continuing jurisdiction in *United States v. Washington,* 384 F.Supp. 312, 333, 347, 416–17 (W.D.Wash.1974).

2. Unless the parties agree on an alternative allocation, the following principles shall govern the allocation of Fraser River sockeye salmon harvest in the Fraser Panel area between the Tribes and the State of Washington after 2010:

A. If the United States and Canada have agreed on a new Annex IV Chapter 4 to the Pacific Salmon Treaty under which the United States' share of the TAC in the Fraser Panel area remains the same as its share in 2010, the tribal/non-tribal allocation shall remain the same as the allocation agreed herein for 2010;

B. If the United States and Canada have agreed on a new Annex IV Chapter 4 of the Pacific Salmon Treaty under which the United States' share in the Fraser Panel area is between 16.5% and 22.4% of the TAC, the tribal allocation shall be 11.2% of the TAC plus one third of the amount that the United States' share exceeds 16.5% but is less than 22.4% of the TAC, and the remainder shall be allocated to the State of Washington;

C. If the United States and Canada have agreed on a new Annex IV Chapter 4 of the Pacific Salmon Treaty under which the United States' share in the Fraser Panel area is 22.4% of the TAC or greater, the tribal allocation shall be as provided in subparagraph (B), above, and the remainder of the United States' share shall be allocated to the State of Washington, provided, that at the point where the State's allocation of the TAC equals the Tribal allocation, and above this point, the State of Washington and the Tribes shall share the harvest opportunity equally;

D. If the United States and Canada have agreed on a new Annex IV Chapter 4 of the Pacific Salmon Treaty under which the United States' share is less than 16.5% of the TAC in the Fraser Panel area, the tribal/non-tribal allocation shall be as agreed between the State of Washington and the Tribes or, lacking such agreement, as determined by the federal court with jurisdiction in *United States v. Washington;*

E. In any year after 2010 for which the United States and Canada have not agreed on a new Annex IV Chapter 4 to the Pacific Salmon Treaty, the tribal/nontribal allocation of whatever share of the TAC in the Fraser Panel area the United States proposes to harvest during the impasse with Canada shall be as follows:

i. If the United States proposes to harvest 16.5% of the TAC in the Fraser Panel area, the tribal/non-tribal allocation shall remain the same as in 2010;

ii. If the United States proposes to harvest between 16.5% and 22.4% of the TAC in the Fraser Panel area, the tribal allocation shall be 11.2% of the TAC plus one third of the amount that the United States' proposed harvest exceeds 16.5%, but is less than 22.4% of the TAC, and the remainder of the United States' proposed harvest shall be allocated to the State of Washington;

iii. If the United States proposes to harvest 22.4% or more of the TAC in

the Fraser Panel area, the tribal allocation shall be as provided in subparagraph E(ii), above, and the remainder of the harvest proposed by the United States shall be allocated to the State of Washington, provided, that at the point where the State of Washington's allocation of the TAC equals the tribal allocation, and above this point, the State of Washington and the Tribes shall share the harvest opportunity equally;

iv. If the United States proposes to harvest less than 16.5% of the TAC in the Fraser Panel area, the tribal/non-tribal allocation shall be as agreed between the State of Washington and the Tribes or, lacking such agreement, as determined by the federal court with jurisdiction in *United States v. Washington.*

3. It is further agreed that the parties shall meet not later than March 1, 2010, and enter into good faith discussions regarding the allocation of Fraser River sockeye salmon harvest between the Tribes and the State of Washington after 2010.

4. Modification of this Stipulation is to be made only in a written document signed by the parties and approved and entered by the Court as an amendment to this Stipulation.

5. Except as expressly stated herein, this Stipulation and Order does not and shall not alter the terms of any settlement agreement or Court Order entered in *United States v. Washington.*

6. This Stipulation and Order does not affect the power of the United States under Section 6 of the Pacific Salmon Treaty Act, 16 U.S.C. § 3635.

7. The parties' agreement to this Stipulation is only to the extent authorized by their respective laws.

8. In the event that *United States v. Washington* shall be terminated, the United States District Court for the Western District of Washington shall retain such jurisdiction as is necessary to enforce the terms of this Stipulation and Order.

## VI. OTHER ADMINISTRATIVE MATTERS

1. This Stipulation and Order does not alter orders governing treaty/non-treaty sharing of any fish other than sockeye within the Fraser Panel Area. This Stipulation and Order applies only to fisheries within the Fraser Panel Area.

2. The question of whether Fraser River sockeye caught in Alaska should be included in the allocation between treaty and non-treaty fishers in Washington at issue in *United States v. Washington* Subproceeding 90–1 will not be pursued for the period of time that the Fraser River sockeye chapter of the 1999 Annex is in effect, nor for any subsequent years for which the allocation between treaty and non-treaty fishers in Washington is determined under Paragraph V.2A, B, C, E(i), (ii) and (iii) above, or as agreed under Paragraph V.2D or E(iv). The parties agree that if the consolidated *United States v. Washington* Subproceedings 83–6 and 90–1 are reinstated on the calendar of the trial court, or the question of accounting for harvests in Alaska is raised by another party in some other proceeding, any catches of Fraser River sockeye in Alaska that occur during the time the Fraser River sockeye chapter or the 1999 Annex is in effect or during the time the allocation between treaty and non-treaty fishers in Washington is determined under said Paragraph V.2A, B, C, E(i), (ii) and (iii), or as agreed under Paragraph V.2D or E(iv), will not accrue against any state or tribal party.

3. This Stipulation and Order contains all the terms and conditions agreed upon by the parties. No other understandings, oral or otherwise, regarding the subject matter of this Stipulation and Order shall be deemed to exist or to bind any of the parties hereto.

#### ORDER

■ The parties having assented to the foregoing Stipulation as evidenced by the signatures of their respective Counsel, it is hereby

ORDERED, THAT THIS STIPULATION IS HEREBY ADOPTED AS AN ORDER OF THIS COURT.

ORDER DENYING PRIVATE LAND OWNERS' MOTION FOR RECONSIDERATION AND GRANTING–IN–PART AND DENYING–IN–PART PRIVATE LAND OWNER'S MOTION FOR AMENDMENT OF THE COURT'S CLARIFYING ORDER

Subproceeding No. 89–3

(February 25, 2000)

EDWARD RAFEEDIE, Senior District Judge.

The Court has read and considered the papers filed in connection with Intervenor-defendants Alexander, Adkins and United Property Owners of Washington, et al. (hereinafter "Private Property Owners") unopposed Motion For Reconsideration Or, Alternatively, Motion For Amendment of the Court's Clarifying Order, and deeming the matter fit for resolution without the need for oral argument, now reaches the following CONCLUSIONS:

■ [1] The Private Property Owner's Motion For Reconsideration relies on substantially the same argument and authority that was rejected by the Court in fashioning its Order Clarifying Implementation Order Re Tribal Access Across Private Upland Property ("Clarifying Order"). The only "new" basis for the Private Property Owners' request for reconsideration is their assertion that the Clarifying Order "fails to consider the burdens imposed upon private owners by requiring them to litigate, on a case by case basis, whether upland access in any particular case is 'reasonable.'" Memorandum In Support of Reconsideration, at 4:2–4. On the contrary, the Court carefully considered the burden imposed on both the private owners and the Tribes, and determined that the Tribes' Treaty rights required the reasonable access defined in the Court's Clarification Order. The burden imposed on the private land owners, though regrettable, is not a sufficient basis to abrogate the Court's previous ruling, Accordingly, the Private Property Owners' Motion For Reconsideration is HEREBY DENIED.

■ [2] The Private Property Owners argue in the alternative that the Court's Clarification Order should be amended to "reimpose a proper balance between tribal shellfish rights and private property interests." Memorandum In Support of Reconsideration, at 6:4–5. The Private Property Owners specifically ask for three amendments to the Clarification Order. First, they seek a requirement for "the posting of a bond by the requesting Tribe in an amount sufficient to pay for any damage to privately owned upland property and the reasonable attorney fees and costs incurred by the Private Property Owners defending against requests for upland access." Memorandum In Support of Reconsideration, at 6:7–9. The Court does not believe it has the authority to impose such a condition on Tribal access. See, e.g., United States, et al. v. State of Washington, et al., 135 F.3d 618, 641–42 (9th Cir.1998). Further, the Tribes' sovereign

immunity makes such a condition impracticable, if not impossible. Therefore, the Court rejects the Private Property Owners' first proposed amendment.

■ [3] Second, the Private Property Owners request that the Court direct the Special Master "to impose the least intrusive means of access necessary to allow Tribes to enter upon tidelands to harvest shellfish." Memorandum In Support of Reconsideration, at 6:15–17. Explicit in the Court's original Implementation Order was the Court's desire to impose the least intrusive burden on the Private Property Owners, a desire which is not inconsistent with the Clarifying Order. Accordingly, the Court HEREBY ORDERS that in instances where the Special Master finds that no "reasonable" access exists pursuant to section 7.2.4 and the Clarifying Order, the Special Master shall impose the least intrusive *reasonable* means of access necessary to allow Tribes to enter upon tidelands to harvest shellfish. "Reasonable" for purposes of this order shall be determined in the same manner as defined in the Clarifying Order, at 2–3. Further, the Special Master shall, where reasonable, give preference to existing roads and rights of way. The Court declines, however, to require that the Tribes join additional upland owners before the Special Master as requested by the Private Property Owners.

■ [4] Third, the Private Property Owners request that the Court direct the Tribes to "disclose all income, from all sources, and all assets of any nature, as of the preceding calendar year" for the Special Master to consider in determining whether the economic burden of accessing a particular shellfish bed is "reasonable." Memorandum In Support of Reconsideration, at 6:22–24. The inquiry into whether an economic burden is "reasonable" does not rest on the resources of the Tribes, but

rather on the actual expense required to gain access. Accordingly, the Court rejects the Private Property Owners' request for Tribal disclosure of income.

■ Finally, on its own motion the Court has reviewed the Clarifying Order and finds that the following amendment is appropriate for purposes of clarity. That clause which reads "tribal members can demonstrate the *reasonable* absence of access by boat, public road, or public right of way," Clarifying Order, at 2:15–16, shall be amended to read "tribal members can demonstrate the absence of *reasonable* access by boat, public road, or public right of way."

■ For the foregoing reasons, the Private Property Owners Motion For Amendment of the Court's Clarifying Order is DENIED–IN–PART and GRANTED–IN–PART.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve, by United States mail or by telefax, copies of this Order on counsel for the parties in this matter.

CONSENT DECREE

Subproceeding No. 00–1

(August 18, 2000)

BARBARA J. ROTHSTEIN, District Judge.

On a motion for a temporary restraining order brought by the Skokomish Indian Tribe, the Court held a hearing with the following parties present and represented by counsel: the Skokomish Indian Tribe, represented by Richard Guest; the Port Gamble S'Klallam Tribe, the Jamestown S'Klallam Tribe, and the Lower Elwha Tribal Community of the Lower Elwha Reservation (Lower Elwha Klallam Tribe);

represented by Vernle C. Durocher, Jr.; and the Suquamish Indian Tribe, represented by Michelle Hansen. Following argument, the Court adjourned to chambers to discuss with counsel issues related to tribal management and treaty allocation (as defined in *U.S. v. Washington*) of the Dungeness crab fishery in Hood Canal.

The parties have reached agreement as follows:

1. On August 17, 2000, during the Court's hearing, the Point No Point Treaty Council filed Regulation # S2000-124/Modified, closing the Dungeness crab fishery in Hood Canal effective Sunday, August 20, 2000 at 6:00 p.m. The parties agree that, under these circumstances, the relief requested by the Skokomish Indian Tribe and Court intervention is unnecessary.

2. The parties shall actively pursue mediation and shall notify the Court as to the selection of a mediator acceptable to all parties within seven days of the date of entry of this order. The scope of the mediation shall include the tribal management and treaty allocation (as defined in *U.S. v. Washington*) of the Dungeness crab fishery in Hood Canal for the 2000/2001 season ending April 15, 2001.

3. If the parties cannot mutually agree upon a mediator, the Skokomish Tribe, the Suquamish Tribe, and the legal counsel for the Port Gamble S'Klallam Tribe, the Jamestown S'Klallam. Tribe, and Lower Elwha Klallam Tribe (collectively), shall each, within three days following the expiration of the seven day interval referenced above, submit three names of mediators to the Court and the Court will select a mediator for the parties,

4. Costs of mediation shall be born equally by the parties.

IT IS SO ORDERED and decreed.

### ORDER ESTABLISHING INTERIM HALIBUT FISHERY MANAGEMENT PLAN

Subproceeding 91–1

(March 20, 2001)

THIS MATTER comes before the court on three motions filed by various tribes that participate in Washington's treaty halibut fishery. Each motion seeks entry of an order adopting an interim fishery management plan ("FMP") for the year 2001 commercial halibut fishery. The court has received pleadings filed on behalf of the Makah, Quileute and Quinault tribes (the "Coastal Tribes"), the seven "Inside Tribes" (comprised of the Lower Elwha S'Klallam, Port Gamble S'Klallam, Jamestown S'Klallam, Tulalip, Swinomish, Suquamish and Skokomish tribes), and the Lummi Nation.[1] Having reviewed these pleadings, along with the relevant portions of the record, and being fully advised, the court finds and rules as follows:

### I. BACKGROUND

Pursuant to their inherent management authority, all tribes involved in this halibut fishery have historically adopted FMPs based on negotiated agreement. These FMPs establish fishery opening dates, quotas for different phases of the fishery, catch limits, in season adjustment mechanisms, and dispute resolution procedures. The year 2000 FMP for the commercial fishery was agreed to by eleven of the

1. The Lummi Nation initially supported a 2001 FMP that contained some of the terms proposed by the Makah, along with additional safeguards designed to preserve late season harvest opportunities. However, on February 22, 2001, the Lummi Nation filed a brief joining in the Inside Tribes' opposition to the Coastal Tribes' motion and joining in the Inside Tribes' request for entry of an interim plan based on the 2000 FMP.

twelve interested tribes (except the Quileute, which eventually consented to the 2000 FMP as an interim management measure), and appears to have resulted in an orderly, and generally successful, fishing season. The total allowable catch ("TAC") for the treaty fishery in 2000 was 305,500 pounds. This TAC was pursued during three "sub-fisheries" during the season. The first sub-fishery was a 48 hour "unrestricted opening," which imposed no limitations on catch vessels. The second sub-fishery was a 30 day "restricted opening," during which each vessel was subject to a 500 pound daily landing limit. The third sub-fishery was a variable "mop-up" period after the 30 day restricted opening, designed to capture any allowable catch remaining after the unrestricted and restricted openings.

Because the various participating tribes' usual and accustomed fishing grounds are at diverse locations, and because the fishers' habits and capabilities vary, they have their greatest interest in different sub-fishery phases. The Makah, for example, claim that they rely most heavily on the first unrestricted opening because they are capable of landing a large volume of fish and because the commercial price for halibut is highest early in the season. The Inside Tribes, because of their geographic location and the distribution of halibut through their fishing grounds, place more importance on the 30 day restricted opening of the fishery. Finally, tribes like the Quileute, who tend to fish later in the spring as the weather changes, are more interested than others in the late season mop-up sub-fishery. Late season fishers are also concerned that a high catch rate in the early sub-fisheries can effectively erase the opportunity for late season fishing if the TAC is met or exceeded too soon. The relative importance each tribe places on a particular stage of the halibut fishery has resulted in a divergence of

opinion and, thus far, an inability to agree on a FMP for 2001.

Moreover, the year 2001 fishery is projected to be even stronger than previous years, with a calculated TAC of 406,500 pounds of fish. This 33% increase in stock abundance has spawned additional disputes among the tribes regarding how the TAC should be allocated among them, if at all. Recognizing the need for a FMP to direct the 2001 halibut fishery, even in the absence of complete tribal agreement, the tribes have approached the court with proposed interim management plans to see them through until an acceptable long term FMP can be agreed upon. Although the overall structure of the FMP sought is not in dispute, the details of the parties' proposals differ significantly. In relevant part, the Coastal Tribes propose: 1) an initial 60 hour unrestricted opening with a catch target of 220,000 pounds; 2) additional openings thereafter, beginning on March 22, 2001, designed to bring the total harvest up to 325,200 pounds (80% of the TAC); 3) a 30 day restricted fishery designed to harvest the remaining 81,300 pounds of halibut (20% of the TAC); and 4) additional openings after April 15, 2001, during which any unharvested portion of the TAC may be taken. In addition, the Coastal Tribes' proposal imposes gear limitations not present in previous years, based on their belief that all tribes should "play by the same rules."

The Inside Tribes object to the Coastal Tribes' proposal on three primary grounds: 1) the Coastal Tribes' proposal imposes gear restrictions on halibut fishers that would disadvantage the Inside Tribes' fishing effort; 2) the unrestricted openings are not conservatively designed to guarantee the viability of later restricted openings; and 3) there are insufficient equitable measures provided to adjust for over harvest of halibut during the unrestricted

sub-fishery. Essentially, the Inside Tribes maintain that the Coastal Tribes' proposed management plan does nothing to protect the former's opportunity to participate in this fishery. Therefore, the Inside Tribes have asked the court to "maintain the status quo" by adopting a 2001 FMP that is equivalent to the 2000 FMP and adjusted to reflect this year's increased TAC. Thus, the parties agree that the court must put into place an FMP for the 2001 halibut fishery, and differ only on the terms of that FMP.

## II. DISCUSSION

▮▮▮ The court has retained jurisdiction to consider tribal treaty fishing issues in proceedings ancillary to Judge Boldt's landmark decision in *United States v. Washington*, C70–9213, and the instant parties have consented to the authority of this court to enter an order adopting an FMP for the 2001 halibut fishery. In assessing the various proposals submitted by the parties, the court has focused on two principles. First, the court is obligated to direct management of the fishery in such a way as to preserve and maximize each tribe's treaty right to take fish. *See generally United States v. Washington*, 626 F.Supp. 1405 (W.D.Wash.1985). In addition, the court will respect to the greatest extent possible the tribes' collective authority and ability to manage their fisheries themselves, by mutual agreement.

Turning first to the Coastal Tribes' proposed management plan, the court notes that strenuous objections have been filed by other interested tribes. There is shared concern over whether the Coastal Tribes' proposal would adequately protect tribal fishers' opportunity to harvest halibut in the later stages of the fishery, and whether the proposed plan provides an effective mechanism to compensate tribes adversely effected by an excessive early harvest. Further, the gear limitations proposed by the Coastal Tribes represent an entirely new element that has not been agreed to in the past.

The Inside Tribes' proposed FMP, by contrast, is merely a reiteration of the FMP which was formally agreed to by eleven of the twelve interested tribes, which had the eventual consent of the twelfth, and which proved to be a satisfactory arrangement overall. That proposed FMP retains all the structural, organizational and reporting provisions of the 2000 FMP, and simply changes the numerical values affected by this year's increased TAC.

▮▮▮ Given the totality of the circumstances present in this case, the court finds that the best, and most equitable, course of action is to continue managing the halibut fishery in essentially the same manner as applied during 2000. The court cannot, on the limited record presently before it, adopt alterations to the established regime as extensive as those proposed by the Coastal tribes without obtaining additional information. To determine whether the gear limitations suggested by the Coastal Tribes are necessary and fair, or whether their proposed openings allow for adequate late season catch for other tribes, would require a more thorough trial of the issues and presentation of substantial expert opinion and evidence than is possible at this juncture. The court, therefore, adopts the 2001 Tribal Commercial Halibut Fishery Management Plan as proposed by the Inside Tribes. See 2001 Tribal Commercial Halibut Fishery Management Plan, Exh. B to "Certain Tribes" Motion to Adopt an Interim Halibut Commercial Fishery Plan.[2]

---

**2.** The court notes that the fishery opening date as proposed by all parties was March 15,

## III. CONCLUSION

For the reasons discussed above, the court finds that the 2001 halibut fishery shall be subject to the management plan agreed to by the parties for the year 2000 fishery, with numerical catch values adjusted upwards in light of the increase in this year's total allowable catch. The plan adopted by the court is that proposed by the seven Inside Tribes in their motion for order adopting interim management plan, and that motion [docket 59–1] is, consequently, GRANTED.[3] The Coastal Tribes' motion for adoption of their proposed 2001 management plan [docket 52–1] is DENIED.[4]

## PROPOSED ORDER RE AMENDMENT TO PARAGRAPH G OF ORDER FOR PROGRAM TO IMPLEMENT INTERIM PLAN

### Subproceeding No. 96–2

### (May 08, 2001)

After examination of the stipulation of the parties that Paragraph G of the Order For Program To Implement Interim Plan, 459 F.Supp. 1020, 1037–38, should be amended, the Court finds that the amendment represents a fair and equitable set-tlement of the dispute as to that portion of this subproceeding. This Order is intended to affect only Paragraph G of the Order For Program To Implement Interim Plan, leaving the other provisions of the Order, as previously modified, unchanged.

## ORDER

Paragraph G of the Order For Program To Implement Interim Plan, 459 F.Supp. 1020, 1037–38, is amended to read as follows:

1. Any Tribe party to this case may open a fishery within that Tribe's previously adjudicated usual and accustomed grounds and stations for any species of fish, including non-anadromous fish. Before opening any fishery, the parties shall comply with applicable court orders. If any tribal or state fishery would reasonably be expected to affect another party's fisheries, the party conducting the fishery:

 a. Shall comply with the Stipulation and Order Concerning Co–Management and Mass Marking, entered in *United States v. Washington* Subproceeding 96–3 on April 28, 1997; and

---

2001. To the extent that tribal halibut fishing has not yet commenced, the FMP adopted by the court shall be enforced as if March 20, 2001 was the projected opening date, and all subsequent dates shall be altered accordingly. In the event that fishing has already begun, the remainder of the halibut fishery shall be conducted according to the terms of the FMP adopted herein.

3. The Quileute separately filed a motion for maintenance of status quo and entry of an order adopting interim management plan, in which they urged the court to manage the fishery in keeping with the 2000 FMP as adjusted for the increased TAC. Thereafter, the Quileute joined the Quinault and Makah in requesting entry of the proposed FMP submitted with the Coastal Tribes' motion. In light of that development, the court STRIKES the Quileute's motion [docket 56–1] as withdrawn.

4. There is a distinct possibility that the parties will return to the court in succeeding years seeking further orders establishing management regimes for this, or other, treaty fisheries. In the event that the parties wish the court to issue an order adopting a long-term fishery management scheme, or wish to substantially change the *status quo* and cannot reach a consensus, the interested tribes should present the issue early enough to allow for a hearing and careful consideration by the court. Nevertheless, the parties' good faith attempt to resolve the instant matter with the assistance of Magistrate Judge Arnold is both noted and appreciated.

b. Shall provide data on catch and biological information concerning the fishery to any party who requests it.

2. Upon request, the biologists for the State and biologists for the Tribes shall meet to formulate general principles to be utilized as guidelines to be flexibly applied in the adoption of specific fishing regulations applicable to particular species of non-anadromous fish.

3. Any of the parties may invoke the continuing jurisdiction of this court in order to determine the procedures and/or method for adopting management principles with respect to any particular species of non-anadromous fish. The parties shall comply with the procedures of the Order Modifying Paragraph 25 of Permanent Injunction, entered in *United States v. Washington* on August 23, 1993.

4. Paragraphs G.1 and G.2 do not apply to fisheries in the United States' Exclusive Economic Zone that are subject to a federal fishery management plan adopted under the Magnuson–Stevens Fishery Conservation and Management Act, 16 U.S.C, 1801–1883, or that are governed by federal regulations adopted under that Act or other applicable federal law.

DONE IN OPEN COURT this <u>4th</u> day of <u>May,</u> 2001.

## ORDER GRANTING UNITED STATES' AND DENYING WASHINGTON'S MOTIONS FOR JUDGMENT

Subproceeding No. 01–1 (Culverts)

(September 06, 2001)

THIS MATTER comes before the court on two related motions. The United States has filed a motion to strike, or for judgment on, fifteen of the twenty affirmative defenses asserted in the State of Washington's Answer to the Plaintiff Tribes' Request for Determination ("RFD") and to the United States' Response to the RFD. Washington has also filed what is essentially a cross-motion, seeking judgment on the pleadings regarding the "law of the case" in which it contends that the relief sought in the Tribes' RFD is barred by prior judicial decisions.[1] Having now reviewed the pleadings filed in support of and in opposition to these motions, together with the relevant portions of the record, and being fully advised, the court finds and rules as follows:

## I. DISCUSSION

### A. Washington's Affirmative Defenses

#### *1. Waiver and Estoppel*

The affirmative defenses laid out in paragraphs 6.1 through 6.8 of Washington's answer are based on the doctrines of waiver or estoppel. Washington believes that the United States' conduct in funding and approving Washington's roadway culverts prevents it from now asserting a claim that those culverts violate the plaintiff Tribes' treaty rights. The United States argues that neither waiver nor estoppel are tenable defenses when the United States is acting to enforce the rights of Indian tribes.

■ The United States has correctly identified the binding authority that forecloses Washington's attempt to use waiver or estoppel defenses in this case. *See, e.g., Cramer v. United States*, 261 U.S. 219, 43

---

**1.** Washington's motion for judgment re: law of the case separately seeks judgment as a matter of law on this affirmative defense, which is also embraced by the United States' motion to strike.

S.Ct. 342, 67 L.Ed. 622 (1923) (acts of government agent do not bind government and cannot constitute waiver of Indian rights); *Pine River Logging & Improvement Co. v. United States,* 186 U.S. 279, 22 S.Ct. 920, 46 L.Ed. 1164 (1902) (same); *United States v. Washington,* 157 F.3d 630 (9th Cir.1998) (estoppel defense cannot be asserted to defeat claims enforcing Indian rights); *Swim v. Bergland,* 696 F.2d 712 (9th Cir.1983) (same); *United States v. Ahtanum Irrigation Dist.,* 236 F.2d 321 (9th Cir.1956) (same). Washington has not presented any on-point authority to the contrary, and its argument in opposition to the United States' motion fails to controvert the clear legal principles laid out in the cases cited above. Because the defenses of waiver and estoppel are simply not available to defeat the United States' instant action to enforce the plaintiff Tribes' treaty rights, the government is entitled to judgment as a matter of law on the affirmative defenses asserted in paragraphs 6.1 through 6.8 of Washington's answer.

### 2. Constitutional Defenses

The United States argues that Washington's constitutional defenses, asserted under the Equal Footing Clause, the Guarantee Clause, and the Tenth Amendment to the United States Constitution, are legally insufficient under the instant circumstances. Washington responds that the treaty right asserted in this case may not be consistent with its admission as a state into the federal union, that it may violate the Guarantee Clause's promise of a republican government, and that it impinges on rights reserved to the states under the Tenth Amendment. Washington further argues that these defenses present questions that deserve further development and attention during this litigation and which preclude summary dismissal.

█ The court disagrees. As Washington admits, the Equal Footing doctrine has been rejected as a basis for limiting Indian tribes' treaty fishing rights for a century or more. *E.g. United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). Indeed, these very parties were reminded that Washington's admission "into the Union upon an equal footing with the original states had no effect upon the treaty rights of the Plaintiff tribes." *United States v. Washington,* 157 F.3d 630, 646 (9th Cir.1998) (quoting Final Decision No. 1, 384 F.Supp. 312, 401 (W.D.Wash.1974)). Washington responds that the relief sought in this subproceeding is based not on express treaty rights, but instead on an implied right to habitat conservation, and is thus not subject to the rule last stated. However, that contention rests on a faulty and improper formulation of the plaintiff Tribes' claim. The Tribes and the United States have asked the court to declare that Washington has a duty to manage its culverts in a certain manner so as to guarantee or protect their treaty right to take fish. Whether such a duty exists, and the measure of any such duty, has yet to be determined. What is abundantly clear at this time, however, is that the Tribes are asserting a treaty right, and that right is unaffected by Washington's admission into the union, such that the Equal Footing affirmative defense (paragraph 6.12 of Washington's answer) must fail as a matter of law.

█ The same is true for Washington's Guarantee Clause defense (paragraph 6.17 of Washington's answer). Washington's claim that the Tribes seek to dictate how the state legislature shall act and to control the expenditure of state funds is simply unfounded and contrary to the plain language of the RFD. Moreover, to the extent that Washington will be forced to act in a particular manner in order to

comply with its treaty obligations, that compelled action is no constitutional infringement given the fact that treaties with Indian tribes are expressly part of the "Supreme Law of Land" governing all states. See U.S. Const. Art. VI (containing the "Supremacy Clause"); *Missouri v. Holland,* 252 U.S. 416, 432, 40 S.Ct. 382, 64 L.Ed. 641 (1920). The Guarantee Clause is thus no bar to the relief sought in the plaintiffs' RFD.

■■■■ Washington's defense under the Tenth Amendment (paragraph 6.18 of Washington's answer) can fare no better. The Amendment protects state sovereignty and the federalist structure of our national government, but Washington has nowhere identified any threat to its reserved powers. Again, by operation of the Supremacy Clause, Indian treaties are incorporated into the body of paramount law binding both state and federal governments. There can be no valid Tenth Amendment defense when the United States seeks to enforce an obligation under one of these universally binding legal positions. *Id. See also Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 204, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999).

### 3. Political Question Doctrine

■■■ The United States correctly notes that Washington's political question affirmative defense, asserted in paragraph 6.13 of its answer, cannot be sustained where the case does not implicate the relationship between the coordinate branches of the federal government. *See Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (holding that political question doctrine is implicated in "the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States"). Apparently conceding this

point, Washington argues that a political question is raised because the Tribes have presented claims for which no judicially determinable standards for decision exist. Washington relies primarily on the procedural history of the former "Phase II" of this litigation in support of this argument.

However, Washington overstates the significance of the prior holdings in Phase II. Although the Ninth Circuit Court of Appeals vacated this court's order with respect to the Tribes' right to prevent environmental degradation, it left open the possibility that such a right exists and left for future tribunals the question of how to measure that right. *See United States v. Washington,* 759 F.2d 1353, 1357 (9th Cir. 1985). There is simply no support in the record or case law for the proposition that this court is ill-equipped to determine the appropriate legal standards for deciding the issues presented herein. Under these circumstances, Washington's political question affirmative defense lacks any merit.

### 4. Self-execution of Treaties

■■■ Washington alleges in paragraph 6.14 of its answer that the Stevens treaties at issue in this case are not self-executing and thus not binding on the State absent Congressional ratification. This position has been repeatedly rejected, including by the Supreme Court in closely-related litigation. *See Washington v. Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U.S. 658, 693, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). Nevertheless, Washington seeks to save this affirmative defense by claiming that the particular rights asserted in this subproceeding are only implied by self-executing rights, and are not themselves self-executing. Yet this argument is based on the flawed characterization of the Tribes' claims heretofore rejected by the court. *See supra,* § I.A.2. Because the Tribes are seeking to

measure and enforce their right to take fish, which right is indisputably self-executing, *Passenger Fishing Vessel,* 443 U.S. at 693, 99 S.Ct. 3055, this affirmative defense is legally unavailing.

### 5. *Washington's Compliance With the Endangered Species Act*

■■■ Washington describes its Endangered Species Act ("ESA") compliance affirmative defense as an assertion that "any alleged treaty habitat obligation affecting the State's construction and maintenance of culverts is subsumed by Washington's ESA compliance because the United States has expressly said so." Washington's Opposition to the United States' Motion to Strike at 15. It cites nothing in support of this proposition.

Moreover, Washington's position defies logic. Washington's compliance with the ESA in particular actions or projects does not necessarily satisfy its treaty obligations any more than satisfying its treaty obligations would suffice for compliance with the ESA. The duties imposed by each originate with different legal sources, and are measured by different legal standards. That being so, Washington's ESA affirmative defense essentially reduces to another variation on the waiver and estoppel argument, namely that it has complied with the Stevens treaties "because the United States said so," summarily rejected above. However it is framed, the court concludes that this affirmative defense, set forth in paragraph 6.15 of Washington's answer, cannot survive the United States' motion to strike.

### B. Washington's Motion for Judgment on the Pleadings

■■■ Washington's Motion for Judgment on the Pleadings Re: Law of the Case seeks judgment as a matter of law that the relief requested by the plaintiff

Tribes, and the United States on their behalf, in this subproceeding is barred by the preclusive effect of prior legal determinations, and asks that the litigation be terminated on that basis. Specifically, Washington argues that the Tribes are not, as a matter of law, guaranteed a treaty right to "earn a moderate living" from their treaty fishery because numerous courts have already rejected that contention, citing *Washington Passenger Fishing Vessel,* 443 U.S. 658, 99 S.Ct. 3055, and the *United States v. Washington* complex of cases. Both the Tribes and the United States have filed memoranda opposing this motion, in which they argue that Washington has mischaracterized the nature of the remedy they seek and has misread the holdings on which Washington's argument relies. The United States asks the court to strike this "law of the case" theory as an affirmative defense, which is set out in paragraph 6.11 of Washington's answer.

Having closely reviewed the applicable pleadings, the court rejects Washington's formulation of the relief plaintiffs seek in this matter. Washington's motion proceeds, at the outset, on a faulty premise by suggesting that the Tribes are suing to enforce their right to earn a moderate living. This mischaracterization oversimplifies the remedies sought in the Request for Determination, and unfairly casts it in terms that may facially conflict with prior judicial decisions. Instead, it is clear to the court that the plaintiffs are seeking to prevent the state from interfering with the treaty right of taking fish by affirmatively diminishing the number of fish available for harvest.

Furthermore, the court does not read the cases Washington relies on in the manner which Washington suggests, and rejects the claim that those decisions preclude litigation of the Tribes' instant attempt to ensure that Washington does not

build and manage its roadway culverts in a fashion that impermissibly blocks the passage of fish destined for the Tribes' usual and accustomed fishing grounds. For example, the Ninth Circuit Court of Appeals, in dismissing the Phase II litigation, explicitly recognized that the "State of Washington is bound by the treaty. If the State acts for the primary purpose or object of affecting or regulating the fish supply or catch in noncompliance with the treaty as interpreted by past decisions, it will be subject to immediate correction and remedial action by the courts. In other instances [when the state does not act with the primary purpose of regulating fish supply], the measure of the State's obligation [to avoid environmental degradation] will depend for its precise legal formulation on all of the facts presented by a particular dispute." *United States v. Washington, supra,* 759 F.2d at 1357. Nothing in the *Passenger Fishing Vessel* decision conflicts with this recognition that Washington's duty with respect to the environment, imposed by the treaty, is a realistic possibility.

Whether the Tribes have a treaty-based right to insist on the remedies they seek from the State remains to be determined. But nothing in prior decisions precludes this court from considering the issues raised in the RFD. Because the instant litigation is not controlled or foreclosed by prior rulings, Washington's law of the case affirmative defense fails as a matter of law.

## II. CONCLUSION

For the reasons detailed above, the court finds that fifteen of Washington's affirmative defenses are insufficient as a matter of law. The United States' motion to strike, or in the alternative to grant judgment on, those affirmative defenses is GRANTED and the affirmative defenses are hereby STRICKEN from Washing-

ton's answer. The court also concludes that Washington's motion for judgment on the pleadings is without merit, and that motion is hereby DENIED.

## ORDER GRANTING UNITED STATES' MOTION FOR RECONSIDERATION AND MOTION TO DISMISS STATE'S CROSS–REQUEST FOR DETERMINATION

Sub-proceeding No. 01–1 (Culverts)

(October 26, 2001)

THIS MATTER comes before the court on the United States' Motion to Reconsider Court's Order Denying Motion to Dismiss. The United States requests that the court reconsider its ruling denying the United States' motion to dismiss Washington's cross-request for determination. On September 5, 2001, the court called for responsive briefs, asking the parties to address the issues raised in the United States' motion for reconsideration. Upon closer inspection, more thorough briefing, and further development of this issue, the court finds and rules as follows:

## I. BACKGROUND

On January 12, 2001, the United States initiated this action, together with interested Indian tribes, to force Washington to repair and better maintain its roadway culverts so that such culverts would not impair, but would indeed promote, fish runs. On March 15, 2001, Washington filed its "Answer and Cross and Counter Requests for Determination" in which it asserts a claim against the United States for injunctive and declaratory relief. Washington claims that the United States has "unlawfully injured the State of Washington by ... placing on the State a disproportionate burden to meet any such treat-based duty" and has "managed its lands in such a way as to create a nuisance

that unfairly burdens the State of Washington." State's Answer 31 ¶¶ 7.4, 7.5. On July 20, 2001, this court issued an order denying the United States' motion to dismiss Washington's cross-request for determination. The United States argues, in both its previously filed motion to dismiss and now in its motion to reconsider, that Washington's cross and counter request is improper because (1) the court lacks jurisdiction over Washington's cross-request because of the doctrine of sovereign immunity; and (2) Washington lacks standing to assert claims on behalf of the Indian Tribes.

The United States believes that the court may have "misapprehended or overlooked" its arguments concerning sovereign immunity and standing. Specifically, the United States believes that the court may have erroneously perceived those arguments as being dependent on the United State's alignment as a party in this action.

## II. DISCUSSION

The court will ordinarily deny motions for reconsideration in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence. See Local Rule CR 7(e).

### 1. Sovereign Immunity

 Congress alone has the authority to determine whether and under what circumstances to waive the immunity of the United States. *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Consent to suit cannot be provided by a court or by government officers. *United States v. United States Fid. & Guar. Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). Waivers of sovereign immunity are construed strictly and

narrowly. *United States v. Nordic Vill., Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). The party who "sues the United States bears the burden of pointing to . . . an unequivocal waiver of immunity." *Prescott v. United States,* 973 F.2d 696, 701 (9th Cir.1992). Moreover, "[t]he United States does not waive sovereign immunity by implication; any waiver must be unequivocally expressed." *Metro. Water Dist. of S. Cal. v. United States,* 830 F.2d 139, 142 (9th Cir.1987). The fact that the United States is a plaintiff in this action does not, by itself, waive its sovereign immunity. *See id.* at 143 ("[M]erely by instituting a suit, the United States does not consent to be sued on a counterclaim based on a cause of action for which it has not otherwise given its consent to be sued."). Indeed, "[t]he United States does not waive its sovereign immunity by instituting the action in which a defendant asserts a claim for affirmative relief against the United States." *United States v. City of Los Angeles,* 595 F.2d 1386, 1389 (9th Cir.1979) (emphasis added).

 The institution of an action by the United States may, however, constitute a limited waiver of sovereign immunity with respect to certain counterclaims that may be asserted by the defendant, even absent a statutory waiver of immunity. When the United States institutes an action, it waives immunity as to the counterclaims of the defendant which assert matters in recoupment—matters that arise out of the same transaction or occurrence which is the subject matter of the government's action. Such waivers are limited to the extent of reducing or defeating the government's claim. *See Frederick v. United States,* 386 F.2d 481, 488 (5th Cir. 1967). A judgment which is affirmative in the sense of involving relief different in kind or nature or exceeding the amount of the government's claim is not authorized.

*Id.; United States v. Agnew,* 423 F.2d 513, 514 (9th Cir.1970) ("[A] counter-claim may be asserted against a sovereign by way of set off or recoupment to defeat or diminish the sovereign's recovery, [though] no affirmative relief may be given against a sovereign in the absence of consent.").

■ In its Answer and Cross and Counter Requests for Determination, the State contends that the United States has "unlawfully injured the State of Washington by, among other things, placing on the State a disproportionate burden to meet any such treaty-based duty" and has "managed its lands in such a way as to create a nuisance that unfairly burdens the State of Washington." Answer ¶¶ 7.4, 7.5. The State also claims that federal agencies operate culverts that may block fish passage. These federal actions, the State argues, by decreasing the fish supply, have increased the State's burden to provide the Tribe's with a "moderate living." The State therefore asks the court to declare the alleged federal agency actions to be contrary to the treaty right, if such a right exists, and to compel the federal agencies to inventory and fix their own culverts. State's Answer ¶¶ 8.5–8.7, 8.9–8.11. The United States rightly points out that Washington "does not merely claim that its own liability should be reduced to account for alleged conduct by the United States, but seeks affirmative relief against the United States." Mem. In Supp. of United States' Mot. to Recons. Court's Order Denying Mot. to Dismiss at 3.

Since Washington's claim requests affirmative relief against the United States, this counter request cannot fall within the judicial exception permitting counterclaims for recoupment against the United States. *Fidelity & Guaranty Co.,* 309 U.S. at 511, 60 S.Ct. 653. While it seems that the essence of the State's request is that its own liability should be reduced because of alleged federal actions, its claim is in the form of injunctive relief against the United States. For the reasons cited above, the State cannot seek such relief in the form of a "counter-request," absent an unequivocal waiver of sovereign immunity.[1]

a. Sovereign Immunity Waiver under 5 U.S.C. § 702

The State believes that such a waiver exists. It contends that Congress has provided a waiver of immunity for its counter-request under the Administrative Procedure Act (APA), 5 U.S.C. § 702. This argument is unpersuasive.

■ Section 702 of the APA waives the sovereign immunity of the federal government for a plaintiff aggrieved by a specific agency action. *Hawaii v. Fed. Emergency Mgmt. Agency,* 78 F.Supp.2d 1111, 1122 (D.Haw.1999). While the APA provides congressional consent to sue the United States in certain circumstances, that consent is limited to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. This provision contains two separate requirements. First, the person claiming a right to sue must identify some "agency action" that affects him in a specified manner. "Agency action" is defined in 5 U.S.C. § 551(13) as "[t]he whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." The "agency action" in question must be a "final agency action." *See* 5 U.S.C. § 704. Second, the party seeking review under § 702 must show that he has "suffer[ed] legal wrong" because of the

1. Should it devolve that the State's liability should be reduced because of federal actions, the court can consider this in fashioning relief.

challenged agency action or is "adversely affected or aggrieved" by that action.

■■■■ Washington has not identified a specific "agency action" that has adversely affected it, but instead points to an "array of administrative actions," taken pursuant to statute, in which the United States funded, approved, or permitted the very activities about which the United States now complains. State's Opp'n to Mot. to Dismiss at 9. The court finds this argument insufficient for the purposes of the APA. Washington is not challenging a particular agency action that caused it harm. In fact, Washington has not shown that it "suffered legal wrong" or is "adversely affected or aggrieved" as a result of any particular administrative actions. This failure to allege specific agency action and particular harm precludes waiver of sovereign immunity under the APA. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm.").

### 3. Equitable Principles and In rem Jurisdiction

Washington argues next that the United States is subject to the court's equitable powers under the principle that one seeking equitable relief must first do equity. Washington also argues that the court has *in rem* jurisdiction to protect a fishery res in its custody and may enjoin the United States from interfering with that custody without implicating the United States' sovereign immunity. Both arguments are unpersuasive. As the United States points out, these arguments do not provide the "specific congressional authority" for the

claims asserted by Washington against the United States. *See United States v. Shaw,* 309 U.S. 495, 502–03, 60 S.Ct. 659, 84 L.Ed. 888 (1940) (declining to extend the complete immunity rule in favor of cross-actions, as there is no specific congressional authority to do so); *Graham v. Fed. Emergency Mgmt. Agency,* 149 F.3d 997, 1005 (9th Cir.1998) ("A party bringing an action against the United States 'bears the burden of demonstrating an unequivocal waiver of immunity.'"). Washington has not met its burden. If the treaties are determined to create a duty on the State not to allow its culverts to block fish passage, equitable principles will no doubt play a role in whatever relief the court fashions.[2] *See United States v. Washington,* 157 F.3d 630, 650 (9th Cir.1998). Because equitable principles, however, do not provide the requisite statutory waiver of sovereign immunity, the court does not have jurisdiction over Washington's counter-request seeking affirmative relief against the United States.

### III. CONCLUSION

Because the court finds that Washington has not demonstrated the United States' waiver of sovereign immunity, it is unnecessary to address the standing issue. The United States' Motion for Reconsideration and Motion to Dismiss State's Cross-Request for Determination [docket no. 69–1] is GRANTED.

MINUTE ENTRY — IN CHAMBERS PROCEEDINGS:

Subproceeding 91–01

(March 18, 2002)

■■■■ Pending before the court is the Quileute Tribe's motion for continued

---

**2.** Equitable principles could conceivably require that federal culverts contributing to fish

run degradation be repaired or replaced.

maintenance of status quo and interim management plan, in which motion the Quileute seek a court order requiring the Makah Tribe and Quinault Nation to maintain the status quo with respect to the 2002 commercial tribal halibut fishery. Last year, on March 20, 2001, the court issued an Order Establishing Interim Halibut Management Plan (the "Plan"), in which the court directed the parties to maintain the status quo. This year's opening of the halibut fishery is scheduled for March 18, 2002. The Quileute believe that the Makah and Quinault intend to unilaterally change the terms of the Plan without prior approval of this court.

The Makah and Quinault state otherwise. In their response to the Quileute's motion, the Makah and Quinault state that "[they] intend to abide by the status quo established for the treaty halibut fishery by the Court for the 2001 season, with figures revised to reflect this year's increased tribal allocation." Br. at 1.

It appears, therefore, that the Quileute's motion is moot. Unless or until there is reason to believe that a party's breach of the Plan is imminent, thereby violating this court's order to maintain the status quo, the relief that the Quileute seek appears unnecessary.

The motion [docket no. 76–1] is hereby STRICKEN as moot.

## STIPULATION AND ORDER AMENDING SHELLFISH IMPLEMENTATION PLAN

Subproceeding No. 89–3 (Shellfish)

(April 08, 2002)

EDWARD RAFEEDIE, District Judge.

In an amended opinion filed September 25, 1998, at 157 F.3d 630, the Ninth Circuit Court of Appeals remanded three issues to the District Court for further proceedings: (1) determination of the minimum density of shellfish necessary to establish the existence of a natural bed, (2) the manner of implementing the Tribes' allocation of shellfish from Growers' beds, and (3) the manner of resolving disputes to be included in the Shellfish Implementation Plan, (the "Plan"), 898 F.Supp. 1453, 1463 et seq.

To address issues (1) and (2), the Tribes, the Growers, and the State of Washington have stipulated to revisions of sections six and eight of the Plan. The Tribes and the Growers therefore withdraw their competing proposals to revise the Plan that were filed on or about March 11, 2002. To address issue (3), all parties have stipulated to revisions of section 9 of the Plan.

In addition, the parties have stipulated to minor wording changes in other sections of the Plan to conform the language of the Plan to be consistent with the revisions to section 9.

For the convenience of the Court and the parties, Attachment A to this Stipulation and Order is a complete restatement of the Plan, including all revisions stipulated to by the parties.

## STIPULATION

1. Plaintiff Indian Tribes, Puget Sound Shellfish Growers, and the State of Washington, stipulate that the revisions to sections six and eight of the Shellfish Implementation Plan, as incorporated into the restatement of those sections in Attachment A, resolve issues (1) and (2) remanded from the Ninth Circuit Court of Appeals, as described above, such that Attachment A should be entered as an Order of the Court amending the Shellfish Implementation Plan found at 898 F.Supp. 1453, 1463 et seq.

2. All parties stipulate that the revision of section 9, as incorporated into the restatement of that section in Attachment A, resolves issue (3) remanded from the Ninth Circuit Court of Appeals, as described above, such that Attachment A

should be entered as an Order of the Court amending the Shellfish Implementation Plan found at 898 F.Supp. 1453, 1463 *et seq.*

## ORDER

IT IS HEREBY ORDERED:

■ The Shellfish Implementation Plan, 898 F.Supp. 1453, 1463 *et seq.*, is hereby amended to read as stated in Attachment A to this Stipulation and Order.

## ATTACHMENT A TO STIPULATION AND ORDER AMENDING SHELL-FISH IMPLEMENTATION PLAN

## REVISED SHELLFISH IMPLEMENTATION PLAN

# 1. INTRODUCTION

## 1.1 Objectives of Plan.

The primary objective of this Implementation Plan is to provide a framework, principles, and course of action for effective cooperative management of the shellfish resources subject to Treaty harvest under the Court's decision of December 20, 1994. In effectuating the rights of the Tribes to take shellfish under the Treaties, this Order also recognizes the State's responsibilities for conservation of public shellfish resources, subject to the Treaty right to take fish at usual and accustomed places.

## 1.2 Goals and Procedures.

The Implementation Plan calls for interim and then long term management plans. The management plans are to provide both Treaty and non-Treaty shellfishers, subject to their respective regulatory authorities, the opportunity to harvest their respective shares in an orderly manner, consistent with resource protection. The Plan also provides specific procedures for tribal and non-tribal harvest on State and private lands and waters. To the extent specific procedures in section 6 (applicable to commercial Shellfish Growers) and 7 (applicable to Private Property Owners) conflict with general provisions of the Plan, the relevant specific provisions apply to the Growers and Owners, respectively.

## 1.3 Application of Law.

All provisions of this Plan and all management plans that are developed from it must comply with the Court's December 20, 1994 decision. No part of this plan is intended to repeal any prior decision in *United States v. Washington.*

## 1.4 Requirement of Coordination Among Tribes.

The Tribes will be responsible for coordination with all affected Tribes in the development of management plans or compliance with the interim plan, below, This requirement, however, shall not relieve any party of the obligation to give any notice required herein to any affected party.

## 1.5 Tribes Bound.

The Tribes bound by this implementation plan are: Lummi, Nooksack, Upper Skagit, Swinomish, Tulalip, Muckleshoot, Suquamish, Puyallup, Nisqually, Squaxin Island, Skokomish, Port Gamble S'Klallam, Jamestown S'Klallam, Lower Elwha S'Klallam, Makah, Hoh, Stillaguamish, Sauk Suiattle and Quileute. Other Tribes may become signatories to this Plan by the agreement of all parties to the Plan or by order of the Court.

## 1.6 Shellfish Sanitation Consent Decree.

The Consent Decree Regarding Shellfish Sanitation Issues, entered by the

Court on May 4, 1994, specifies those public health requirements to be applied to Treaty shellfishing activities and establishes an intergovernmental, cooperative system for monitoring, enforcement, and dispute resolution. This Implementation Plan, along with all management plans and agreements reached pursuant to it, shall be developed, applied and interpreted in a manner consistent with that Consent Decree.

### 1.7 Status of Headings.

The headings in this Implementation Plan are for the convenience of the reader and are not intended to change the substance of the Plan.

## 2. PRINCIPLES OF SHARING THE SHELLFISH RESOURCE.

### 2.1 Effective Date of Allocation; Mandating Equitable Adjustments.

The effective date of this Implementation Plan for purposes of calculating allocation of shellfish between tribal and nontribal harvest shall be the date of this Order, unless otherwise agreed between the State and Tribes. With respect to shellfish on the Growers' and Owners' property, the allocation between tribal and non-tribal harvest shall commence on the date a

Tribe gives notice pursuant to Plan sections 6.1 and 7.1, respectively.

### 2.2 Cooperative Management.

Where data is not available to determine the total allowable harvest for purposes of allocation between the Tribes and State, the Tribes and State shall develop a cooperative approach to management with the goal of maximizing harvest and equalizing allocation, consistent with conservation of the resource. This shall apply for both interim and permanent management plans and agreements.

### 2.3 Sustainable Harvest Biomass.

"Sustainable harvest biomass" means the approximate portion of a shellfish resource that can be harvested from a shellfish population on an annual basis in perpetuity. It is analogous to the "sustained yield" or "harvestable surplus" that biologists, using sound and accepted management methods, determine can be harvested from a shellfish bed, or mobile shellfish population, while preserving the ability of the remaining shellfish population to maintain annual production of the sustainable harvest biomass in perpetuity. For certain species, such as crab and shrimp, the sustainable harvest biomass may be achieved by agreed restrictions on the size or sex taken, and/or quantity or location by limiting the type of gear used for the fishery, ensuring that a portion of the biomass remains unharvested.[22]

22. This definition corresponds with the relief provided for tribal harvest of anadromous fish: the court defined the harvestable number of fish in terms of that amount that would not impair the amount of fish needed to maintain the run at existing levels. *See generally Washington I,* 384 F.Supp. at 405–407, 409, 417.

This definition, however, is intended to apply to the order sharing shellfish harvests, not to change existing standards regarding the limited application of state laws to treaty Indians exercising treaty fishing rights.

## 2.4 Management Objectives.

"Management Objectives" means the objectives of each party to meet their respective goals using their share of the harvestable surplus of the resource and the biological goals for the continued long term health of the resource.

## 2.5 Sharing Provisions.

Each Tribe may take, from natural beds, up to fifty percent of the sustainable harvest biomass of any shellfish species within the usual and accustomed areas for that Tribe. The sharing shall be achieved by coordinated management plans. Such sharing shall be subject to the following provisions:

a. Sharing Sustainable Harvest Biomass. The sustainable harvest biomass of a shellfish bed or shellfish resource subject to the Treaty right shall be determined on an annualized basis or other agreed periodic basis. The sharing of shellfish shall take into account all commercial and noncommercial harvests from the sustainable biomass of shellfish. For intertidal areas, the sustainable harvest biomass shall be shared on a bed by bed basis,[23] or on other established boundaries of a public land[24] parcel for sharing the shellfish. Where the sustainable harvest biomass cannot be calculated for a species or area, the harvestable amount to be shared shall be determined using the best fishery management information and practices that ensure conservation and maintain production of shellfish in the area harvested.

b. Adjusting Imbalances. Unless otherwise agreed, all management plans adopted pursuant to this Implementation Plan shall include provisions for addressing imbalances in harvest where a party was not afforded the opportunity to attain its share. The means for addressing imbalances may vary depending upon the species, the management techniques used for specific fisheries, and management imprecisions.

c. Independent Management Discretion. The State and affected Tribe(s) shall have discretion to decide their respective management objectives for the harvest of their respective shares, whether commercial, recreational, ceremonial, or subsistence use.

d. Overlapping Usual And Accustomed Areas. Where two or more Tribes have overlapping usual and accustomed areas, then the combination of tribal harvesting shall not exceed fifty percent of the sustainable harvest biomass, leaving at least fifty percent of the sustainable harvest biomass for non-Indian management.

e. Intertribal Allocation. Allocating the tribal share among affected Tribes shall be determined by the affected Tribes, with the intertribal agreement as appropriate provided to the State. Lack of an intertribal sharing agreement shall not entitle a combination of Tribes to take more than fifty percent of the sustainable harvest biomass of shellfish in a given area.

---

**23.** Where a shellfish bed straddles publicly and privately owned land, the provisions of this section apply to the shellfish on public land only.

**24.** For purposes of this Implementation Plan, "public land(s)" means any land owned by the State, or any of its subdivisions or agencies, unless such land is being leased to a Shellfish Grower.

f. Equal Opportunity. In sharing the opportunity for harvest of a shellfish resource, the State and Tribe may also consider the time of fishing, quality of the shellfish, ease of harvesting, and catch per unit effort for the shellfish involved to ensure that there is equal sharing of the harvest opportunity.

g. Polluted Shellfish And Shellfish Not Available. In allocating the sustainable harvest biomass between the State and affected Tribe(s), shellfish beds that are not presently harvestable due to pollution, development, or other physical causes shall not be counted in the biomass of shellfish beds which can be harvested. This shall not prevent a relay harvest of polluted shellfish in accordance with the Consent Decree Regarding Shellfish Sanitation Issues. Any such relay harvest from a polluted shellfish bed shall be accounted for and allocated separately from sharing of shellfish beds that are approved under Consent Decree.

h. Planted Oyster Beds. Oysters planted on public lands, such as on certain State Parks, that would not exist but for the State having planted those oysters are not subject to a tribal share, The Treaties did not reserve any right to such artificial oyster beds.

i. Beds Staked And Cultivated. To the extent that any shellfish bed on public land is within the definition of "any beds staked or cultivated by citizens" in the Court's relief applicable to commercial Shellfish Growers, then such shellfish beds on public lands are not subject to tribal sharing.

Further, the provisions of section 6.3, related to the creation of new artificial beds, are applicable if the State proposes to create any new artificial beds on public land,

3. **LONG–TERM AND INTERIM MANAGEMENT PLANS FOR THE SHARING OF SHELLFISH RESOURCES ON PUBLIC LANDS OR IN PUBLIC WATERS.**

**3.1 Management Plans.**

Ultimately, tribal and non-tribal harvests of shellfish on public lands and from public waters [25] will take place pursuant to management plans.[26] Those management plans will be developed between the Tribes and State on a government-to-government basis. Once agreed by the parties to the plan, each such management plan shall be effective without further approval of the Court and shall have the same force and effect as this Order.[27]

---

**25.** The relief provided in the above section applies to all shellfish species located on or in all public owned lands, (such as clams, oysters, geoduck clams, and mussels that are embedded in or attached to public owned lands), and to all mobile shellfish species that live in the waters of the State, (such as crab, shrimp, sea cucumber, sea urchin, squid, octopus, and others).

Separate provisions of the Implementation Plan define the State's role in tribal harvest of shellfish on private tidelands, or commercial Shellfish Grower lands.

**26.** As indicated in § 7, such interim and long-term management plans shall also contain provisions specifically applicable to harvest from non-commercial, privately owned tidelands.

**27.** To the extent the parties have already entered interim agreements, those agreements have the same status as future management plans or agreements under this Plan.

### 3.2 Harvests Included.

All tribal harvests of shellfish by Tribes participating in this Implementation Plan, and all non-tribal harvests in areas included within the collective usual and accustomed grounds and stations of the Tribes participating in this Implementation Plan, will be subject to management plans adopted pursuant to this Implementation Plan.

### 3.3 Interim Plan Needed.

Because development of management plans is a long term process, an interim plan is needed to govern all shellfisheries pending adoption of permanent plans.

### 4. INTERIM PLAN FOR STATE AND TRIBAL HARVEST OF SHELLFISH ON PUBLIC LANDS OR FROM PUBLIC WATERS.

### 4.1 Scope of Interim Plan.

This interim plan shall govern shellfisheries from the date of entry of this Order until permanent or long term management plans are adopted for particular species of shellfish. The interim plan sets out procedures all persons and parties covered by this Implementation Plan shall follow until permanent or long term management plans are adopted.

### 4.2 Closure of Commercial Shellfisheries.

The State and Tribes shall close all commercial shellfisheries and prohibit the commercial landing of all shellfish on public lands or from public waters, within thirty days after entry of this Order, except where a signed interim agreement between the State and all affected Tribes is in place regarding a specific commercial shellfishery.

### 4.3 Adjusting Non-commercial Fisheries.

After entry of this Order, the State shall adjust non-commercial shellfisheries within forty-five days after any Tribe makes a written request to the Washington Department of Fish and Wildlife (WDFW) to do so, if necessary to ensure that no more than fifty percent of the harvestable amount will be taken by tribal or non-tribal fisheries, including commercial and noncommercial combined. A dispute over the necessity or extent of the adjustment to be made shall be subject to the dispute resolution procedure of sections 4.7 and 4.8.

### 4.4 Shellfish Beds With Inadequate Data.

For beaches where data is not available for determining the sustainable harvest biomass and allocation between the State and all affected Tribes, the affected Tribes and the State will:

a. manage the beach to allow for affected Tribes to take up to fifty percent of the jointly estimated shellfish harvest opportunity until more specific data is available.

b. jointly identify shellfish beds needing a survey and develop a prioritized list and time line to complete surveys and provide for more accurate management and sharing on these beaches, within efficient biological management.

### 4.5 Opening A Fishery By Agreement.

Where no interim agreement is in place thirty days after the entry of this Order, a

shellfishery closed or adjusted pursuant to section 4.2 or 4.3 may only be opened or enlarged after compliance with the procedures in section 4.6. Shellfisheries may proceed at any time, however, if agreement is reached between the State and all affected Tribes, notwithstanding the procedures otherwise applicable under this section.

### 4.6 Opening A Fishery Without Agreement.

Where the State or a Tribe desires to open or enlarge a shellfishery that has been closed or adjusted pursuant to section 4.2 or 4.3, it shall comply with the following procedure (unless an interim agreement is in place):

a. Before proceeding, the State and all affected Tribes shall confer at least one time in an effort to reach agreement regarding the proposed fishery.

b. Failing agreement, the party (Tribe(s) or State) proposing to open the fishery shall provide to the other party a proposed regulation for the fishery, in writing, at least fourteen days before the fishery is scheduled to begin. The party proposing the harvest shall be able to provide a sound fisheries management basis for a determination that a harvestable surplus exists and that a fishery can be operated that will not interfere with the sharing principles ordered by this Court. However, this is not intended to shift the burdens, described below, associated with contesting a fishery. The regulation (or other documents provided with the regulation) shall contain, at a minimum, the following information:

(1) The dates and hours the fishery will be open;

(2) The catch area(s) open for harvest;

(3) The type of fishery to be opened (commercial or non-commercial);

(4) The species to be taken, including an estimate of or upper limit on the amount to be taken and the basis of the estimate;

(5) The estimated effort;

(6) The gear to be allowed;

(7) Provisions for record keeping and harvest reporting, including a schedule to ensure a timely exchange of information; and

(8) Any other information necessary for a specific fishery (such as, for example, daily limits for non-commercial fisheries).

In addition, information regarding enforcement and monitoring plans for the fishery shall be available to the State or Tribes upon request.

### 4.7 Contesting State or Tribal Regulations and Dispute Resolution.

A Tribe or the State may object to a proposed regulation. The party objecting must state the objection in writing and serve it on the entity proposing the fishery not more than ten days after receipt of the regulation, and at least three working days before the fishery is scheduled to begin. The objection must be based on a well-founded assertion that the proposed regulation would result in:

(1) an overharvest on an allocation or conservation basis in violation of the standards set by the Court in *United States v. Washington,* or other conservation standards agreed to by the State and affected Tribes; or

(2) otherwise violate this Implementation Plan or other applicable orders of the Court. The objection must state the reasons for the objection, the data on which it is based, and any other pertinent information available to the objecting party.

### 4.8 Dispute Resolution During Interim Plan.

No contested fishery shall begin unless a decision is rendered through the dispute resolution procedures of section 9 to allow the fishery. To the extent necessary, the Magistrate Judge (or Technical Advisor, if applicable, as provided for by § 9.1.2) may order the State or affected Tribe to comply with the allocation and sharing principles described by this order. In addition, the following rules shall apply:

a. The objecting party shall arrange for a hearing to be held before the Magistrate Judge (or Technical Advisor, if applicable) no more than ten working days from the date of service of the objection (see Dispute Resolution, section 9).

b. The Magistrate Judge (or Technical Advisor, if applicable) shall render a decision no more than ten working days after the conclusion of the hearing. No fishery shall open until a decision is rendered by the Magistrate Judge (or Technical Advisor, if applicable).

c. Where an emergency exists, (for example, where the proponent's opportunity to fish may be lost by delay), the Magistrate Judge (or Technical Advisor, if applicable) may change the above time limits if the party requesting a change in the time limits has acted in a diligent and timely manner.

### 4.9 Obligation to Adjust Catch and Comply With Sharing Order.

Where there is a shellfish harvest without agreement, the State or affected Tribe(s) shall either comply with this section as needed, or contest the regulation as provided above. When a Tribe authorizes the harvest of shellfish without agreement, then the State shall reduce or adjust State regulated harvests as necessary to allow for the proposed tribal harvest. State regulated harvests shall not take a tribal share of shellfish as defined by the sharing principles, above. Tribal or State fisheries opened under this subsection shall not exceed the tribal or State share authorized by this Court and shall be adjusted by the Magistrate Judge (or Technical Advisor, if applicable), if necessary, to comply with and not exceed the tribal or State share.

### 4.10 Tribal Ceremonial Shellfish Harvests.

Notwithstanding the provisions of section 4.2 through 4.9, a Tribe may open a fishery for unanticipated ceremonial purposes by emergency regulation for a specific time period and for a specific allowable harvest amount.

### 5. DEVELOPMENT OF PERMANENT PLANS TO GOVERN STATE AND TRIBAL HARVESTS OF SHELLFISH FROM PUBLIC LANDS OR PUBLIC WATERS.

### 5.1 Order to Develop Plans.

Long term management plans shall be developed separately for each species of shellfish (or groups of related species, such as all crab species) for which fisheries are to take place on public lands or from public waters. Those management plans may be divided into sub-plans for specific geo-

graphic regions, for types of fisheries (commercial, non-commercial; subtidal, intertidal; etc.), or on any other agreed basis. Each management plan shall govern both tribal and State shellfisheries. Unless otherwise agreed, each management plan shall be subject to comprehensive review and agreement by the State and Tribes every five years.

### 5.2 Order to Share Information and Establish Planning Committees.

The State and Tribes shall exchange all available information in either side's possession regarding the status of shellfish populations and fisheries taking place on those populations, in response to reasonable requests for the same, to assist in carrying out their management responsibilities.

### 5.3 Joint Technical Working Committee.

In addition, the State and Tribes shall establish a joint technical working committee to perform tasks, including the following:

a. Exchange and review new and existing information;

b. Establish assessment methodologies;

c. Identify and prioritize management needs;

d. Develop annual or other periodic management plans.

### 5.4 Elements of permanent plans.

In addition to complying with the allocation ordered by the Court or otherwise agreeing, certain basic elements should be included in all management plans between State and Tribe(s).

Those elements include:

a. Definitions of relevant terms.

b. Procedures for identification of the location of shellfish resources.

c. Procedures for assessing and estimating shellfish populations and the sustainable harvest biomass.

d. Identification of geographic boundaries to be used for management and allocation of shellfish harvests (management or allocation "units"), including procedures for how and when boundaries can be modified once adopted.

e. Identification of management periods and the duration of management plans.

f. Procedures for establishing the amount to be harvested from each management area.

g. Procedures for establishing how allocations will be measured for each management or allocation unit. In intertidal areas, unless otherwise agreed or determined by the Court, harvest management shall afford both Treaty and non-Treaty harvesters the opportunity to harvest fifty percent of the harvestable shellfish resource on each public beach, or tideland parcel having established or agreed boundaries, so long as consistent with public health and conservation requirements.

h. Procedures for enacting pre-season and in-season regulations. These will include the amount of notice to be given before a fishery begins and requirements for exchanges of information.

i. Provisions regarding the content of regulations. At a minimum, these will include identification of the manage-

ment plan under which the regulation is issued, the species to be harvested, the harvest areas, the purpose of the harvest, the gear to be used, the expected effort, the expected harvest, and the dates and times of opening and closing of the fisheries. Unless addressed in a Tribal Ordinance, the regulations will also identify the monitoring system to be used.

j. Provisions regarding law enforcement for Treaty and non-Treaty shellfishing.

k. Provisions for record keeping and harvest reporting shall include: commercial WDFW shellfish receiving tickets, Treaty Indian receiving tickets, agreed sport harvest estimates, and agreed Treaty Ceremonial and Subsistence estimates.

l. Provisions for identification of tribally authorized harvesters taking shellfish and tribal representatives engaged in surveys, population estimates, and other management activities, including tribal fish managers, as well as tribal enforcement personnel.

m. Provisions for modifications of management plans.

## 6. COMMERCIAL SHELLFISH GROWERS.

The parties are bound by the definitions prescribed by the Court in this Order, the December 20, 1994 and August 28, 1995 Memorandum Decisions and Orders, and the Ninth Circuit decision, as amended September 25, 1998; and any other relevant order in *United States v. Washington.* In addition, the parties will agree to a chart showing the minimum density of commercial shellfish species needed to establish the existence of a natural bed (i.e.,

able to support a commercial livelihood on a sustainable basis) of shellfish, referred to hereafter as Exhibit A. The values included in Exhibit A shall hereafter be referred to as the "natural bed thresholds". The species to be included in Exhibit A will be agreed to, but will include at least Manila clams, native littleneck clams, butter clams, horse clams, Pacific oysters, Olympia oysters, geoducks, eastern softshell clams and cockles. The natural bed threshold for each species will be determined by geographic regions as agreed by the parties, and by time intervals set forth in Exhibit A or otherwise agreed on by the parties. The parties shall also agree on what constitutes a sustainable commercial harvest, including the appropriate time interval for harvesting to constitute a sustainable commercial harvest, for each species and region The parties shall have six months from the date of this Order to reach agreement on all these matters. Any disagreements remaining after six months regarding the species, geographic regions, time intervals, what constitutes a sustainable commercial harvest, or the natural bed threshold for any particular species, region and time interval, shall be resolved by the dispute resolution procedure of § 9, except that the parties will be permitted a full opportunity to engage in all discovery permitted by the Federal Rules of Civil Procedure as well as to present expert testimony. Upon completion of Exhibit A, by agreement or dispute resolution, the time period set forth in § 6.1.4 shall commence.

### 6.1. Determination Of Tribal Shellfish Allocation on Grower Beds.

Determination of the quantity of shellfish a Tribe is entitled to harvest from

natural beds or enhanced natural beds (i.e., natural beds enhanced by Growers) on property owned or controlled by a Grower is triggered by notice to the Grower of the Tribe's interest in commencing harvest.

6.1.1 Any Tribe interested in commencing harvest on property owned or controlled by a Grower shall provide notice ("Harvest Notice") to every other affected Tribe and to the Grower. The notice shall specify the particular property owned or controlled by the Grower upon which harvest is requested to occur, and shall include the name, street and mailing address, and telephone number of a tribal representative. Each such notice, and all information received by the Tribe(s) pursuant to the below, shall be made subject to a nondisclosure agreement in a form to be agreed upon by the parties.

The Grower shall provide the information required by this § 6.1.1 Harvest Notice to the Tribes in writing within sixty days of the receipt of any such tribal notice.

In addition, the Tribes shall be given the opportunity to inspect the beds located on the land owned or controlled by the Growers. The Tribes shall give the Grower fourteen calendar days notice prior to the proposed date of inspection ("Inspection Notice"). The inspection shall occur as noticed by the Tribes and shall take place at a reasonable time. The Grower may accompany the tribal representatives during the inspection.

Upon receipt of a Harvest Notice the Grower shall provide the requesting Tribe with the following:

a. A description of how the Grower demarcates portions of the Grower's property for purpose of managing or keeping records of shellfishing activities. (Each separately demarcated area shall be referred to as a "management unit" for purposes of this Implementation Plan.)

b. The specific location of each management unit on the Grower's property.

c. For each commercial species listed in Exhibit A, on each management unit, the Grower shall determine if the sustainable yield density (i.e., the quantity of mature marketable shellfish per square foot that could be harvested on a sustainable basis) at the time enhancement began exceeded the natural bed threshold identified in Exhibit A for the corresponding time period and region. If it is established by agreement or dispute resolution that a shellfish bed had less than the natural bed threshold set forth in Exhibit A at the time that enhancement activities began, any such bed shall be deemed artificial. The Grower shall specify the basis for his or her assertions, including all information used to determine whether a natural bed was present prior to the time enhancement began.

d. For beds asserted to be natural beds (i.e., exceeding the natural bed identified in Exhibit A), the Grower shall specify the quantity of shellfish that the Grower asserts could be harvested on a sustainable basis, absent the Grower's and prior Growers' current and historic enhancement/cultivation activities, and the basis for that assertion. The Grower's operations

are not required to cease or be changed in any way while the sustainable harvest level is being determined.

e. Shellfish beds shall be presumed to be artificial (and accordingly not subject to tribal harvest) for all management units where the Grower certifies that the only shellfish beds present are the result of off-bottom or an equivalent form of cultivation.

6.1.2 The Tribes shall review the Harvest Notice data provided by the Grower(s) in § 6.1.1, and any certification under § 6.1.1(e), and may conduct an inspection of the beds, if any, within one year of receipt of the Harvest Notice data. A Tribe may also request that the Grower provide all or some of the information described in subsections 6.1.2(a) through (d), if necessary for the Tribe(s) to determine whether to accept the Grower's assertions regarding the existence of a natural bed or the sustainable harvest that would exist absent the Grower's and prior Growers' current and historic enhancement/cultivation activities. That information shall be provided within 90 days of such a request. Unless the Grower's submission under subsection 6.1.1 is disputed in writing by a Tribe within the one-year period after receipt of Harvest Notice data, during which one-year period the Tribes may evaluate any information provided and conduct any inspection upon a proper Inspection Notice, the Grower's submission provided under § 6.1.1 shall be final and conclusive.

a. The nature and extent of all enhancement activities undertaken by the Grower and prior Growers' since enhancement began, if any, along with all documentation of such enhancement activities in the possession of the Grower.

b. To the extent that any of the shellfish present on any management unit are the result of seeding or transplanting of shellfish from other locations, the Grower shall provide all documentation in the Grower's possession relating to the dates and quantities of all such seeding and transplantation. The source of the seed or transplanted shellfish shall also be identified, including specifically the management unit of that Grower's property if such property was the source of the seed or shellfish.

c. All harvest records in the Grower's possession for each management unit, by species. All harvest records that are not specific to particular management units shall also be provided, along with any information the Grower possesses regarding which management unit or units the shellfish were harvested from.

d. All other information in the Grower's possession that is relevant to (a) each assertion under § 6.1.1 that no natural bed of any species was present at a particular location when the Grower began cultivation or enhancement activities at that management unit, and (b) the sustainable yield of each natural bed of any species that would exist absent the Grower's and prior Growers' current and historic cultivation/enhancement activities at that management unit.

6.1.3 If the parties agree on the location of any natural or enhanced natural beds and the quantity of tribal harvest permitted from each such bed, harvest shall

commence according to the provisions specified in § 6.2. Harvest shall also commence to the extent that there is agreement as to any bed or group of beds, meaning that the parties need not be in full agreement with respect to all beds prior to beginning any harvest. The quantity of tribal harvest permitted from each enhanced natural bed shall be fifty percent of the sustainable shellfish production (yield) from such beds that would exist absent the Grower's and prior Grower's current and historic enhancement/cultivation activities. For example, if ten clams per square foot were a sustainable yield sufficient to support a commercial livelihood at the time that enhancement began, and if a 100 square foot Grower's bed yielded ten clams per square foot on a sustainable basis absent the Grower's efforts to enhance the output (1000 clams), and that same bed produces fifty clams per square foot as a result of the Grower's labor (5000 clams), the Tribes would be entitled to fifty percent of the 1000 clams or 500 clams. The sustainable harvestable level shall not include shellfish found in areas that are closed to shellfishing due to pollution.

To the extent of any disagreement which the parties are unable to work out themselves, the parties shall submit the issue to the dispute resolution procedure of § 9. The burden of proof whether a bed is artificial, and the amount of sustainable shellfish production that would exist absent a Grower's and prior Growers' current and historic enhancement/cultivation activities, shall be on the Growers.

6.1.4 Times When The Tribes May Give Notice Under § 6.1.1.

Tribes initially have one year after the completion of Exhibit A to give a harvest notice pursuant to § 6.1.1 to Growers subject to the Implementation Plan. After that one-year period, a Grower may operate free of additional notices of tribal claims for a three-year period. At the end of such three-year period, the Tribes shall have a ninety-day period during which they may provide notice pursuant to § 6.1. above. At the end of the ninety-day period, the Grower shall again have a three-year period free from additional tribal notices or claims. The ninety-day open period for giving notice under § 6.1 shall continue to alternate thereafter with a three-year period during which no such notice may be given.

During the ninety-day period available for Tribes to give a Harvest Notice pursuant to § 6.1.1 either a Tribe or a Grower may also give notice requesting a change in the previously agreed or established tribal harvest allocation. Such notice of a requested change must be based upon a change in circumstances affecting the harvestable quantity of shellfish that would be present absent the Grower's and prior Growers' current and historic enhancement/cultivation activities. The party asserting the change of circumstances will have the burden of proof to establish the change in circumstances and the burden of proof to establish the new amount of the allocation.

6.2 **Harvest Plans.**

Not later than thirty days after a final determination has been made of the location of one or more natural beds or

enhanced natural beds and the sustainable harvestable quantity of shellfish that could be taken from such natural beds or enhanced natural beds absent the Grower's and prior Growers' current and historic enhancement/cultivation activities, whether by agreement or through dispute resolution, the Grower and affected Tribe(s) shall coordinate the development of a harvest plan.

The harvest plan shall contain, at a minimum, the following: (1) the times for tribal harvest; (2) the species and amount of shellfish and the location from which they are to be harvested; (3) the number of tribal harvesters that can safely be present on a bed to conduct a harvest; (4) the appropriate method of access that will avoid damage to the Grower's crops; (5) the method of harvest, e.g., blanket or spot digging; (6) a process for notification and change of harvest plan due to unusual circumstances and/or catastrophic mortalities.

The Tribe(s) must complete its harvest of allotted shellfish during the time period prescribed in the harvest plan and shall not be permitted to make up any shortfall in future harvest periods except to the extent otherwise permitted in the harvest plan itself.

The harvest plan shall be compatible with the Grower's farming operations and protect the Grower's crops while respecting the tribal treaty right to harvest from natural beds. The harvest plan shall not impose any more restrictions on the Tribe(s) than are necessary to protect the Grower's operations and crops from harm. To minimize impact to a Grower's beds, a Grower and the Tribe(s) may agree that the tribal allocation from a particular Management Unit be taken from any alternative Management Unit under that Grower's control, provided it is within the affected Tribe(s) usual and accustomed harvest areas and the density, quality and accessibility is equal or better than the Management Unit where the natural bed is located. Where the harvest of the natural bed would cause irreparable harm to a Grower's artificial or enhanced natural bed to the point that the Grower in good faith will not harvest the natural bed, the harvest plan need not provide for tribal harvest from that natural bed. The following are illustrative of such circumstances:

a. An artificial bed of Manila clams cultivated over natural beds of butter or horse clams. Where typically there are multiple year classes of Manila clams in a bed at any one time and the Grower harvests only the mature clams periodically and leaves young clams behind to mature, the harvest of deep horse or butter clams would cause severe damage to the shallow Manila clams on top.

b. A natural bed of Manila clams under an artificial bed of Olympia oysters. Olympia oyster beds are continually culled and only adult oysters are harvested. The bed is never completely barren of Olympia oysters and thus there can be no access to clams underneath such oysters without risk of severe damage to the oysters.

c. When a Grower in good faith does not harvest his or her artificial or enhanced natural bed while awaiting changes in market conditions and harvest of the underlying natural bed would cause severe damage to the artificial or enhanced natural bed.

If the Grower and affected Tribe(s) are unable to negotiate an acceptable harvest plan within a reasonable period of time, the matter may be submitted for dispute resolution pursuant to § 9.

The Tribes will be responsible for coordination of the development and implementation of harvest plans with all Tribes with a right to harvest shellfish from a particular Grower(s). If, during any harvest, the Tribe takes shellfish from beyond the agreed upon boundaries or causes any damage to the Grower's property, the parties shall attempt to resolve the matter informally. If there is no resolution, the parties shall submit the matter to dispute resolution pursuant to § 9, Growers shall have no duty of care for tribal members on their property nor shall they be held liable for any nonintentional tort (e.g. negligence) should a tribal harvester sustain an injury while on a Grower's property.

No Grower may, instead of providing a Tribe the opportunity to harvest, insist that the Tribe take a money payment or take shellfish harvested by the Grower, as the tribal right is a right to take the shellfish by a tribal harvest. Nothing in this Plan, however, shall be interpreted to foreclose the parties from voluntarily negotiating such an agreement; the Grower simply may not force such an agreement on any Tribe.

### 6.3 Creation of New Artificial Beds or Enhancement of Existing Natural Beds.

Nothing in this Plan shall be construed to limit a Grower's ability to enhance an existing natural bed or create a new artificial bed. If a Grower plans to enhance an existing natural bed or create a new artificial bed, the Grower shall give written notice to the affected Tribe(s) of his or her intention. The notice shall be provided at least sixty days prior to the proposed enhancement or creation of the bed and shall include the following: the location and species of the proposed bed and a summary of information known to the Grower regarding the history of harvest and enhancement of any species of shellfish listed in Exhibit A on the property. In addition, the notice shall explain the basis for the Grower's determination that the sustainable yield of shellfish is below the natural bed threshold in Exhibit A or if it is above the threshold, what the sustainable harvest yield is.

If the sustainable yield density (i.e., the quantity of mature marketable shellfish per square foot that could be harvested on a sustainable basis) of the species proposed for cultivation is below the natural bed threshold in Exhibit A the Grower shall be entitled to one hundred percent of the harvest of that species in the future.

If the sustainable yield density exceeds the natural bed threshold from Exhibit A for the species proposed to be enhanced, the Grower may enhance that natural bed, however, a harvest plan must be developed to provide the tribes with fifty percent of the sustainable harvest that would exist absent the Grower's proposed enhancement activities.

If a Tribe contests the Grower's conclusion that there is no natural bed (i.e. the Grower's statement that the species proposed for enhancement or cultivation is below the natural bed threshold set forth in Exhibit A) in the location of the

proposed enhanced or artificial bed, the Tribe shall so notify the Grower within thirty days of receiving the notice. The Tribe shall explain the basis for its position, In addition, the Tribe shall be given the opportunity to inspect the location of the proposed bed upon fourteen days notice to the Grower. The inspection shall then occur as noticed by the Tribe at a reasonable time. The Grower may have a representative accompany the Tribe during the inspection.

Where shellfish not proposed for cultivation are identified at levels which exceed the defined natural bed threshold in Exhibit A in the location where the artificial bed is planned, a harvest plan will be developed to provide the Tribes with fifty percent of the sustainable harvest of such natural bed. The tribal harvest level will not increase should the cultivation efforts for the proposed artificial bed species incidentally enhance yields of the natural bed species. If in redesigning his or her beds to create a new artificial bed, a natural bed is to be destroyed, the Grower shall only do so in good faith if it is deemed by the Grower to be necessary for their operations. A Grower will not destroy natural beds in bad faith.

In the event that an unanticipated species of shellfish establishes a new artificial bed as a result of a Grower's efforts to create a new artificial bed for another species, the Grower shall be entitled to one hundred percent of the harvest of that unanticipated species. An example of this would be cockles settling in geoduck predator exclusion tubes and surviving in an area where there was no natural bed of cockles previously and cockles were not the notified species for artificial bed creation.

If the parties are not able to agree on the presence or absence of a natural bed or the sustainable harvest that would exist absent the Grower's proposed enhancement/cultivation activities from a natural bed, it will be subject to dispute resolution. The Grower shall have the burden of proof. The Grower, pending the resolution of the matter by dispute resolution, will be permitted to continue with any enhancement or cultivation activities at his or her own risk: that is, the Grower may proceed with his or her plans at the risk that the dispute resolution could hold that the proposed area contains a natural bed that will require the development of a harvest plan with the affected Tribe(s).

### 6.4 No General Regulation of Grower's activities.

Nothing in this Plan shall be interpreted as interfering in any way with the right of a Grower to engage in predator control activities or in any other activities designed to manage or benefit the Grower's land. Moreover, nothing in this Plan shall constitute a limit on a Grower's right to redesign his or her tidelands, even if such redesign results in the destruction of a natural bed (e.g., constructing a dike for Olympia Oysters which causes the substrate to change and eliminates a clam bed).

### 7. PRIVATE PROPERTY NOT USED FOR COMMERCIAL SHELLFISH GROWING.

Determination of the location of shellfish populations, population estimates, and regulations governing the harvest of shellfish

from privately owned tidelands not being used for commercial shellfish production shall be subject to both interim and permanent management plans adopted by the Tribes and the State. Included within those plans, however, shall be additional measures applicable to harvests from privately owned tidelands, as described below,

### 7.1 Population Surveys And Population Estimates.

Tribes shall survey privately owned tidelands to determine the existence of shellfish populations prior to commencing harvest on a particular tideland.

The Tribes' surveys and population estimates shall be made consistent with the following rules, unless otherwise agreed between a Tribe and a Property Owner:

7.1.1 A survey to determine whether shellfish are present shall occur on each privately owned beach no more than once every three years. The cost of the survey is to be paid for by the Tribe. The manner and method of any survey must be of the type currently in use by the State of Washington.

7.1.2 An on-site population estimate shall occur no more than once per year. The cost of any estimate shall be paid by the Tribe.

7.1.3 Shellfish population information and data regarding a privately owned beach shall be shared with WDFW and the Property Owner.

7.1.4 Surveys and population estimates shall be done at reasonable times during daylight hours whenever feasible.

Night surveys shall occur only when necessary.

7.1.5 Notice of a survey or population estimate shall be provided to the Property Owner no less than one month in advance of the survey or estimate. The notice shall include the name, street and mailing addresses, and telephone number of a tribal representative responsible for the administration of the survey or population estimate.

7.1.6 Notice shall be provided by certified mail, fax, or personal service. The Tribes may chose the type of service. The Private Property Owner shall provide the address or phone number to the Tribe where that Owner will accept service of the notice. If such information is not provided by the Private Property Owner to the Tribe, notice need only be by publication. In addition, survey schedules will be made available on a telephone hotline operated by the Tribe, if the Tribe has the means to provide such a hotline.

7.1.7 The Property Owner and the State may have representatives present during the survey and population estimate.

7.1.8 The Tribes need not conduct a comprehensive survey or population assessment of all properties potentially subject to tribal harvesting before being permitted to exercise Treaty harvest rights. However, as to a particular property, a survey or population assessment must be done prior to any tribal harvest.

7.1.9 Nothing in this Plan shall prevent a Private Property Owner from conducting his or her own survey or pop-

ulation assessment. The Private Property Owner may then, if the results of such a survey or estimate differs from the results of the tribal survey or estimate, contact the Tribes in writing and inform them of any discrepancy. If the parties are unable to resolve the matter, it shall be submitted to the dispute resolution procedures of § 9 according to the procedure set forth in this Plan.

### 7.2 Tribal Harvest.

In addition to the rules governing tribal harvests that are contained in management plans developed with the State, tribal harvests from private tidelands shall also be governed by the following requirements:

7.2.1 A tribal regulation opening private property for shellfish harvesting shall take into consideration the density of shellfish present and the size of the area to be harvested and limit the number of persons who may harvest accordingly.

7.2.2 The regulation opening private property for shellfish harvesting shall provide for monitoring and enforcement of the harvest. The regulation shall also ensure that proper sanitation procedures will be followed by all tribal harvesters.

7.2.3 The regulation opening private property for shellfish harvesting shall indicate the quantity of shellfish that may be taken, limits that apply to individual harvesters, if any, the purpose of the harvest (commercial, subsistence, ceremonial, or a combination), and the dates and times when harvest may take place.

Harvests may occur at night only if necessary. All harvests of properties less than 200 feet in width shall be limited to five days per calendar year. If a property is 200 feet or wider along the beach front, the number shall be increased by one additional harvest day per calendar year for every additional fifty feet of property.

7.2.4 There shall be no upland access to the private tidelands. The Tribes may access the private tidelands by water, across public lands, or by public rights of way only. Nothing in this Plan, however, shall prevent a Private Property Owner from voluntarily agreeing to upland access, although no Tribe has a right to insist on such access from the Tideland Owner.

7.2.5 Notice of a tribal harvest on private property shall be provided to the Property Owner and WDFW no less than one month in advance of the harvest. The notice shall include the name, street and mailing addresses, and telephone number of a tribal representative responsible for the administration of the harvest.

7.2.6 Notice shall be provided by certified mail, fax, or personal service. The Tribes shall chose the method of service. The Private Property Owner shall provide the address or phone number at which such notice will be received. If no address is provided, notice may be by publication.

7.2.7 If during any harvest, the Tribe damages the property of a Tideland Owner or in any way fails to harvest as stated in the notice provided to the Owner, the Owner may submit the issue to the dispute resolution procedures of § 9 as set forth in this Plan.

**7.3 Dispute Resolution.**

A Private Property Owner may challenge a proposed tribal harvest of shellfish from their property through the dispute resolution procedure of section 9 by complying with the following requirements:

7.3.1 An objection to a proposed tribal harvest must be made in writing to the Tribe's fishery department, stating the nature of the objection, the reasons for the objection, any data upon which the objection is based, and identifying any documents upon which the objection is based.

7.3.2 An objection must be based on a claim that the Tribe's plan for harvest is not consistent with the Court's orders in this case, an applicable management plan developed pursuant to this Implementation Plan, or other applicable law.

7.3.3 An objection to a proposed tribal harvest must be received by the Tribe not less than five working days before the harvest is scheduled to begin.

7.3.4 If the Property Owner posts a bond in the amount of $10 per lineal feet of waterfront of the property at issue, the Tribe may not harvest pending the outcome of the dispute resolution.

7.3.5 The Magistrate Judge (or Technical Advisor, if applicable) shall have discretion as to whether a decision will be made based upon the written submissions of the parties or after a live hearing.

**7.4 Rights of Private Property Owners**

Nothing in this Plan shall be interpreted to limit in any way the rights of a Private Property Owner to build docks or other structures on their property.

**8. MISCELLANEOUS PROVISIONS.**

**8.1 Proposals To Establish New Artificial Shellfish Beds.**

8.1.1 The State shall exercise powers granted under State law regarding permits needed for shellfish enhancement (shellfish transfer permit, import permit, Hydraulic Project Approval). A person seeking to plant shellfish seed, place gravel or other substances, or otherwise enhance natural shellfish populations through additions to the natural environment in or beneath state waters, shall comply with these requirements. When an application is received to undertake such an activity, the authorizing Department shall within five working days notify the Tribes by mailing a copy of the application to each affected Tribe's fishery department.

8.1.2 Before granting such a permit application, the appropriate State Department may ascertain the status of existing shellfish populations, if any, where the activity is proposed to occur, to determine whether a natural shellfish bed exists. Where a Department of the State performs the assessment of existing shellfish populations, the Department shall establish procedures whereby the Tribes shall be afforded the opportunity to participate in the assessment of the status of the existing shellfish populations. Where the State chooses not to perform the assessment, the Tribes may perform an assessment.

8.1.3 Whenever the State proposes to grant a permit under section 8.1.1, it

shall notify the Tribes at least twenty working days before issuance of a permit. The State shall maintain copies of all documents that establish the basis for the granting of the permit and make them freely available to the Tribes at any Tribe's request. A decision to issue a permit, and the State's conclusion, if any, regarding the presence of a natural shellfish bed, may be challenged by a Tribe and is subject to the dispute resolution procedure if agreement is not otherwise reached.

8.1.4 Any person to whom a permit is issued to enhance shellfish production for commercial purposes shall be subject to any applicable provisions of this plan and the Court's orders to the extent of tribal Treaty rights.

## 8.2 Proposals To Lease Tide lands Or Bedlands For Purposes Of Commercial Shellfish Growing.

The purpose of this section is to address state leasing of tidelands and bedlands for shellfish harvest and production and to insure any Treaty right to harvest shellfish from such leased premises is addressed prior to leasing. Public lands under lease shall be considered the same as property owned by the lessee during any lease, and are subject to this court's provisions for private property or Growers' property. The following additional provisions apply for all new or renewal leases for shellfish harvest or cultivation.

### 8.2.1 State Notice to Tribes.

Whenever the State proposes to lease tidelands or bedlands for purposes of a commercial shellfish operation, then the State shall give affected Tribes notice of the lease application and provide a date certain when the Tribes can communicate to the State regarding the assertion of a Treaty harvesting right to shellfish on the property, in accordance with this section. Notice to the affected Tribes shall include a description of the use to be authorized by the lease. The State shall evaluate the land to be leased to determine whether a natural bed exists. For leases where no enhancement activity has occurred recently enough to affect the density of shellfish beds, the determination of the existence of a natural bed shall be based upon whether the sustainable yield density exceeds the natural bed threshold identified in Exhibit A for the corresponding species, region and time period. For leases where past or present enhancement activity has affected the current density of shellfish beds, the determination of the existence of a natural bed shall be based upon a determination of whether the sustainable yield density at the time enhancement began exceeded the natural bed threshold identified in Exhibit A for the corresponding species, time period and region. The Tribes shall be afforded the opportunity to participate in the State's assessment of whether a natural bed exists on the land. The results of any state evaluation shall be communicated to the Tribes at least thirty calendar days before a lease is issued and shall specify the date that the state proposes to enter into a lease. The underlying data and documents shall be made available to the Tribes.

### 8.2.2 Tribal Assertion of Treaty Right on Leased Land.

If an affected Tribe(s) contends that there is a natural bed subject to Treaty harvest by the Tribe on property to be

 

leased, the affected Tribe may notify the Washington Department of Natural Resources (DNR) in writing within thirty days after the state evaluation is provided to that tribe, or ten days before the proposed date of leasing, whichever is earlier in time, The notice shall describe the shellfish to which the Tribe asserts a Treaty right, the basis for that information, and the area and shellfish involved. Upon timely receipt of such notice, DNR shall not lease the property until compliance with paragraph 8.2.3. or 8.2.4, below. If a Tribe does not provide notice under this paragraph to DNR after DNR has complied with paragraph 8.2.1, then the Tribe shall not take shellfish from the leased property for the initial term of that lease, or ten years, whichever is shorter.

### 8.2.3 State and Tribal Agreement.

If a Tribe has provided notice under paragraph 8.2.2, the State and Tribe and/or prospective lessee may agree to a plan where the Tribe's Treaty right to take shellfish from the land to be leased is addressed before issuance of the lease. Any such agreement in writing shall be binding on the State, Tribe, and other persons who enter it for the term of the agreement.

### 8.2.4 Dispute Resolution.

Absent an agreement between the State and Tribe and/or proposed lessee for tribal harvest from the bed to be leased, a Tribe or the State may seek dispute resolution. The dispute shall be heard by the Magistrate Judge pursuant to section 9, and the lease shall not be issued until the dispute resolution procedure has been completed. At such dispute resolution, the Magistrate

Judge shall determine whether or not the leased activity authorizes the taking of shellfish subject to Treaty harvest. If the lease does not, then the lease may be issued. If the land to be leased contains shellfish subject to Treaty harvest, then the Magistrate Judge shall determine the tribal harvest of a Treaty share of such shellfish consistent with the sharing principles within paragraph 6.1.3, or allow the State and Tribe to reconsider agreement regarding tribal harvest.

### 8.2.5 State Renewals.

Whenever the State proposes to renew a lease of tidelands or bedlands for purposes of a commercial shellfish operation, if the presence or absence of a natural bed has not previously been determined, the procedures of part 8.2.1 shall be followed as if a new lease is being proposed. If an affected Tribe has previously not objected to leasing of the property after notice pursuant to Section 8.2.1, then the State need only provide such Tribe notice of its intent to renew the lease. If the lease only allows the lessee to grow and harvest a species known not to reproduce naturally in the lease location (such as Pacific Oyster beds outside areas of Hood Canal), or to grow and harvest shellfish cultivated by an off-bottom or equivalent method and there has been no natural bed identified on the site during past leases, then the State may satisfy paragraph 8.2.1 by informing the affected Tribe of the nature of the proposed lessee use. The Tribe, however, may inspect such property or assert a claim under 8.2.2, if there is a natural bed subject to a Treaty harvest.

## 9. DISPUTE RESOLUTION.

### 9.1 *Magistrate Judge Proceedings*

Any dispute arising under the implementation plan shall be brought before the Honorable **Ricardo S. Martinez,** United States District Court Magistrate Judge for the Western District of Washington, at 1010 Fifth Avenue, Suite 304, Seattle, WA 98104 ("Magistrate Judge") or a successor Magistrate Judge appointed by the Court.

9.1.1 Unless the dispute is initially heard by a Technical Advisor as provided for by paragraphs 9.1.2 and 9.1.3 of this stipulation, the Magistrate Judge will hear and determine disputes arising under the implementation plan.

9.1.2 For a dispute that raises technical questions of fishery management and/or allocation, the parties may file a joint request with the Magistrate Judge that such dispute be heard by a Technical Advisor. Based upon such request, the dispute will be heard, as soon as possible, by the Technical Advisor selected by the Court after nominations by the parties. If the parties do not agree that a Technical Advisor is necessary, the dispute will be heard by the Magistrate Judge who has the authority to decide the issues himself, appoint experts, and/or refer the matter to the Technical Advisor.

9.1.3 If the dispute is heard by the Technical Advisor, the Technical Advisor will establish procedures consistent with procedures described in paragraph 9.2 of the implementation plan. The written decision of the Technical Advisor shall resolve the dispute unless a party to the case files a petition for review of that decision before the Magistrate Judge within twenty days of the filing of the original decision. Such petition shall state the basis for seeking review, identify the alleged error in the decision, and identify the relief sought. Upon a timely petition, the Magistrate Judge shall conduct a de novo review and shall consider additional briefing, proceedings, evidence, and argument offered by the parties, if any. During the consideration of any petition filed under this subsection, the written decision of the Technical Advisor remains in effect and shall govern the parties' conduct unless and until the Magistrate Judge overturns the written decision or expressly stays its enforcement.

9.1.4 For disputes where a written decision by the Technical Advisor does not resolve the dispute, a written decision of the Magistrate Judge shall resolve the dispute unless a party to the case files a petition for review of that decision before the Honorable Robert S. Lasnik, United States District Judge, 1010 Fifth Avenue, Suite 911, Seattle, WA 98104, within twenty days of the filing of the original decision. Such petition shall be considered pursuant to the procedures established in Federal Rule of Civil Procedure 72(b), except for the time permitted to file the petition for review, as stated above. During the consideration of any petition filed under this subsection, the written decision of the Magistrate Judge remains in effect and shall govern the parties' conduct unless and until the Court overturns the

written decision or expressly stays its enforcement.

## 9.2 Procedure For Hearings Before the Magistrate Judge.

The Magistrate Judge will establish the procedures to be used in hearing disputes; those procedures may be informal, but shall include the following, except where specified otherwise in this implementation plan:

9.2.1 An opportunity for all parties to a dispute to present their evidence and arguments in writing and orally.

9.2.2 An opportunity for all parties to a dispute to respond to or challenge the evidence and arguments presented by other parties.

9.2.3 The opportunity for all parties to the dispute to compel the production of persons or documents from other parties that are necessary for full consideration of the matter in dispute.

9.2.4 In addition to considering evidence presented by experts called by a party to the dispute, the Magistrate Judge may consult with persons with technical expertise as necessary to the resolution of disputes. The persons consulted shall not be associated with the Tribes, any agency of the State of Washington (other than academic institutions) or any other person affected by the outcome of the dispute, absent agreement of all parties to the dispute. Advice received from a technical expert shall be shared with all parties to the dispute.

9.2.5 The Magistrate Judge shall issue a written opinion stating the decision and the reasons for the decision within ten working days of the conclusion of the hearing or the submission of evidence by the parties to the dispute, whichever is later, unless agreed otherwise by the parties and the Magistrate Judge. In fashioning resolution to a dispute, the Magistrate Judge shall have no authority to eliminate the Treaty fishing rights of an entire Tribe. The Magistrate Judge may, however, order that the Tribe pay damages or may implement some other appropriate remedy.

9.2.6 The Magistrate Judge shall not be required to hear or consider disputes in the order in which they are presented. The Magistrate Judge shall consider a dispute on an emergency or expedited basis when a delay would make the dispute moot due to the closure of a fishing season or other equivalent circumstance.

### Exhibit A

Minimum density of commercial shellfish species necessary to constitute a natural bed (e.g., able to support a commercial livelihood on a sustainable basis) at the time cultivation of a bed began.

| Time Period | Manila clams | | | Pacific oysters | | | Native littlenecks | | | Butter clams | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | North Sound | South Sound | Hood Canal | North Sound | South Sound | Hood Canal | North Sound | South Sound | Hood Canal | North Sound | South Sound | Hood Canal |
| 2016 - 2020 | | | | | | | | | | | | |
| 2011 - 2015 | | | | | | | | | | | | |
| 2006 - 2010 | | | | | | | | | | | | |
| 2001 - 2005 | | | | | | | | | | | | |
| 1996 - 2000 | | | | | | | | | | | | |
| 1991 - 1995 | | | | | | | | | | | | |
| 1986 - 1990 | | | | | | | | | | | | |
| 1981 - 1985 | | | | | | | | | | | | |
| 1976 - 1980 | | | | | | | | | | | | |
| 1971 - 1975 | | | | | | | | | | | | |
| 1966 - 1970 | | | | | | | | | | | | |
| 1961 - 1965 | | | | | | | | | | | | |
| 1956 - 1960 | | | | | | | | | | | | |
| 1951 - 1955 | | | | | | | | | | | | |
| 1946 - 1950 | | | | | | | | | | | | |
| 1941 - 1945 | | | | | | | | | | | | |
| 1936 - 1940 | | | | | | | | | | | | |
| 1931 - 1935 | | | | | | | | | | | | |
| 1926 - 1930 | | | | | | | | | | | | |
| 1921 - 1925 | | | | | | | | | | | | |
| 1916 - 1920 | | | | | | | | | | | | |
| 1911 - 1915 | | | | | | | | | | | | |
| 1906 - 1910 | | | | | | | | | | | | |
| 1901 - 1905 | | | | | | | | | | | | |
| 1896 - 1900 | | | | | | | | | | | | |
| 1891 - 1995 | | | | | | | | | | | | |
| 1886 - 1890 | | | | | | | | | | | | |
| 1881 - 1885 | | | | | | | | | | | | |
| 1876 - 1880 | | | | | | | | | | | | |
| 1871 - 1875 | | | | | | | | | | | | |
| 1866 - 1870 | | | | | | | | | | | | |
| 1861 - 1865 | | | | | | | | | | | | |
| 1856 - 1860 | | | | | | | | | | | | |
| 1851 - 1855 | | | | | | | | | | | | |

| Time Period | Cockles | | | Geoduck | | | Olympia oysters | | | Horse clams | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | North Sound | South Sound | Hood Canal | North Sound | South Sound | Hood Canal | North Sound | South Sound | Hood Canal | North Sound | South Sound | Hood Canal |
| 2016 - 2020 | | | | | | | | | | | | |
| 2011 - 2015 | | | | | | | | | | | | |
| 2006 - 2010 | | | | | | | | | | | | |
| 2001 - 2005 | | | | | | | | | | | | |
| 1996 - 2000 | | | | | | | | | | | | |
| 1991 - 1995 | | | | | | | | | | | | |
| 1986 - 1990 | | | | | | | | | | | | |
| 1981 - 1985 | | | | | | | | | | | | |
| 1976 - 1980 | | | | | | | | | | | | |
| 1971 - 1975 | | | | | | | | | | | | |
| 1966 - 1970 | | | | | | | | | | | | |
| 1961 - 1965 | | | | | | | | | | | | |
| 1956 - 1960 | | | | | | | | | | | | |
| 1951 - 1955 | | | | | | | | | | | | |
| 1946 - 1950 | | | | | | | | | | | | |
| 1941 - 1945 | | | | | | | | | | | | |
| 1936 - 1940 | | | | | | | | | | | | |
| 1931 - 1935 | | | | | | | | | | | | |
| 1926 - 1930 | | | | | | | | | | | | |
| 1921 - 1925 | | | | | | | | | | | | |
| 1916 - 1920 | | | | | | | | | | | | |
| 1911 - 1915 | | | | | | | | | | | | |
| 1906 - 1910 | | | | | | | | | | | | |
| 1901 - 1905 | | | | | | | | | | | | |
| 1896 - 1900 | | | | | | | | | | | | |
| 1891 - 1995 | | | | | | | | | | | | |
| 1886 - 1890 | | | | | | | | | | | | |
| 1881 - 1885 | | | | | | | | | | | | |
| 1876 - 1880 | | | | | | | | | | | | |
| 1871 - 1875 | | | | | | | | | | | | |
| 1866 - 1870 | | | | | | | | | | | | |
| 1861 - 1865 | | | | | | | | | | | | |
| 1856 - 1860 | | | | | | | | | | | | |
| 1851 - 1855 | | | | | | | | | | | | |

| Time Period | Eastern softshell clams | | |
|---|---|---|---|
| | North Sound | South Sound | Hood Canal |
| 2016 - 2020 | | | |
| 2011 - 2015 | | | |
| 2006 - 2010 | | | |
| 2001 - 2005 | | | |
| 1996 - 2000 | | | |
| 1991 - 1995 | | | |
| 1986 - 1990 | | | |
| 1981 - 1985 | | | |
| 1976 - 1980 | | | |
| 1971 - 1975 | | | |
| 1966 - 1970 | | | |
| 1961 - 1965 | | | |
| 1956 - 1960 | | | |
| 1951 - 1955 | | | |
| 1946 - 1950 | | | |
| 1941 - 1945 | | | |
| 1936 - 1940 | | | |
| 1931 - 1935 | | | |
| 1926 - 1930 | | | |
| 1921 - 1925 | | | |
| 1916 - 1920 | | | |
| 1911 - 1915 | | | |
| 1906 - 1910 | | | |
| 1901 - 1905 | | | |
| 1896 - 1900 | | | |
| 1891 - 1995 | | | |
| 1886 - 1890 | | | |
| 1881 - 1885 | | | |
| 1876 - 1880 | | | |
| 1871 - 1875 | | | |
| 1866 - 1870 | | | |
| 1861 - 1865 | | | |
| 1856 - 1860 | | | |
| 1851 - 1855 | | | |

ORDER DENYING THE SAMISH TRIBE'S MOTION TO REOPEN JUDGMENT

Subproceeding No. 01–2

(December 19, 2002)

BARBARA JACOBS ROTHSTEIN, District Judge.

THIS MATTER comes before the court on the Samish Indian Tribe's (hereinafter "Samish" or "Tribe") motion, filed pursuant to Rule 60(b)(6), to reopen the judgment in *United States v. Washington*, 476 F.Supp. 1101 (W.D.Wash.1979), *aff'd* 641 F.2d 1368 (9th Cir.1981). In this motion, the Tribe argues that its 1996 federal recognition from the Department of Interior is an "extraordinary circumstance" that warrants reexamination of its treaty fishing rights under the Treaty of Point Elliott, which rights were previously denied the Tribe. Nine of the 22 treaty tribes (referred to herein as the "Opposition Tribes"), fearing dilution of their fish harvest and disruption of long-standing allocation and management agreements, oppose the Samish's motion, as does, by separate pleading, the United States.[1] The Opposition Tribes and the United States believe both that there are procedural bars to the Samish's motion and that the Tribe's federal recognition is not an "extraordinary circumstance" that justifies reopening this case.

Having reviewed the documents filed in support of and in opposition to this motion, and considered the parties' oral arguments, the court finds and rules as follows:

## I. BACKGROUND

### A. Treaty Fishing Rights

In 1970, the United States, on its own behalf and as trustee for seven Indian tribes, brought suit seeking an injunction requiring the State to protect those tribes' share of runs of anadromous fish. Seven other tribes intervened as plaintiffs. In 1974, United States District Judge Boldt ruled that all fourteen tribes had treaty fishing rights under several Indian treaties, including the Treaty of Point Elliott, which entitled them to take up to fifty percent of the harvestable fish passing through their off-reservation fishing grounds. *United States v. Washington,*

---

[1] The State of Washington has filed a brief statement of non-opposition to the Samish's motion.

384 F.Supp. 312 (W.D.Wash.1974) (*"Washington I"*). *Washington I* declared the treaty fishing rights of only those "14 Indian entities" that had participated as plaintiffs in that proceeding and that were defined as "Treaty Tribes" in the ruling.[2] 384 F.Supp. at 405. *Washington I* contemplated that additional Indian entities might become parties in the case if any such entities demonstrated that it was "entitled to exercise fishing rights under the treaties construed herein within the Western District of Washington." *Id.*

On September 20, 1974, shortly after Judge Boldt's initial decision, the Samish Tribe, as well as the Duwamish, Snohomish, Steilacoom, and Snoqualmie Tribes, moved to intervene in *United States v. Washington,* to assert their own treating fishing rights. Judge Boldt referred the issue of the Samish's treaty status to Magistrate Judge Robert Cooper sitting as a Special Master. After a five-day trial, Magistrate Judge Cooper determined that the Samish was neither a treaty tribe nor a political successor to the signatory treaty tribe.

The Samish appealed this determination to Judge Boldt, who thereafter conducted a *de novo* evidentiary hearing. The Samish submitted additional evidence to Judge Boldt, who heard argument in January 1977. Judge Boldt issued his decision in March 1979, ruling that the Samish were not a Treaty Tribe as defined in *Washington I* and that its members were not entitled to exercise treaty rights under the Treaty of Point Elliott. *United States v. Washington,* 476 F.Supp. 1101, 1111 (W.D.Wash.1979) (*"Washington II"*).

Judge Boldt found that the Samish Tribe was not a successor in interest to any treaty signatory and had not maintained an organized tribal structure. *Id.* at 1106. Judge Boldt also concluded that the Samish were not entitled to exercise treaty rights because the Tribe was not "federally recognized" by the United States Department of Interior (DOI). *Id.* at 1111.

The Samish appealed Judge Boldt's ruling to the Ninth Circuit, arguing *inter alia* that Judge Boldt improperly adopted without substantial change the proposed findings and conclusions submitted by the United States. *United States v. Washington,* 641 F.2d 1368, 1371 (9th Cir.1981). The Samish also appealed Judge Boldt's Finding of Fact No. 27, in which Judge Boldt found that the Samish had "not lived as a continuous separate, distinct and cohesive Indian cultural or political community." 476 F.Supp. at 1105. Because Judge Boldt had in fact adopted most of the United States' proposed findings of fact and conclusions of law, the Ninth Circuit applied close scrutiny to the Samish's claims. The Ninth Circuit concluded that Judge Boldt had applied an incorrect legal test in determining whether a tribe had treaty rights. Rejecting the notion that federal recognition or nonrecognition was dispositive, the Ninth Circuit instead stated that the "single necessary and sufficient condition for the exercise of treaty rights is" whether a "group of Indian descendants ... have maintained an organized tribal structure." 641 F.2d at 1372.

Applying this test to the record, the Ninth Circuit concluded "[a]fter close scru-

---

**2.** On appeal, the State challenged Judge Boldt's confirmation of Treaty rights for the then-unrecognized Stillaguamish and Upper Skagit, Sauk–Suiattle tribes, which thereafter attained federal recognition between Judge Boldt's decision and the appeal. The Ninth Circuit affirmed Judge Boldt's conclusion that these tribes were entities possessing treaty rights, holding that "[n]onrecognition of the tribe by the federal government ... can have no impact on vested treaty rights." *United States v. Washington,* 520 F.2d 676, 692 (9th Cir.1975).

tiny, ... that the evidence supported [Judge Boldt's] finding of fact" that the Samish had not functioned since treaty times as "continuous separate, distinct and cohesive Indian cultural or political communit[ies]." *Id.* at 1373. As for the effect of the Samish's nonrecognition, the court stated that "[n]onrecognition of the tribe by the federal government ... may result in loss of statutory benefits, but can have no impact on vested treaty rights." *Id.* The court, therefore, affirmed Judge Boldt because "the district court correctly resolved this question despite its failure to apply the proper standard." *Id.* at 1374. The Samish appealed this decision to the United States Supreme Court, which denied certiorari. 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982).

By the early 1980s, therefore, the Samish Tribe had failed to persuade at least three judicial bodies—Magistrate Judge Cooper, Judge Boldt, and the Ninth Circuit—that it was entitled to be a party to this case.

## B. Federal Recognition Proceeding

In 1972, after Congress began conditioning eligibility for most programs benefitting Indians upon status as a federally recognized tribe, the Samish first sought federal recognition. See 25 U.S.C. §§ 450–450n. In 1978 the DOI published final regulations governing the procedure for official recognition of Indian Tribes. Apparently, the DOI took no action on the Samish's original petition until after the 1978 regulations were promulgated, and the Samish filed a revised petition under the new regulations in October 1979. Thereafter, the Bureau of Indian Affairs (BIA) conducted an independent inquiry into the Samish's recognition petition. The recognition petition was denied first in 1982, when the Assistant Secretary for

Indian Affairs first published a preliminary determination concluding that the Samish should not be recognized. Samish objected to this decision and submitted a response and additional information and, after several years of delay, the Deputy to the Assistant Secretary for Indian Affairs issued a final decision in 1987 denying federal recognition to the Samish. 52 Fed. Reg. 3709 (Feb. 5, 1987).

In 1989, the Samish filed a federal action in this district, alleging that the BIA's denial of its recognition petition violated the Tribe's due process rights and that the Samish was the successor in interest to the treaty Samish Tribe for purposes of showing entitlement to federal recognition. *Greene v. Lujan,* No. 89–645Z (W.D.Wash.).[3] The Tulalip Tribe sought to intervene in this case, believing that if Samish were to gain federal recognition, then treaty fishing rights would likely follow. Judge Zilly denied Tulalip's intervenor application but permitted it to participate as *amicus curiae.* On an interlocutory appeal, the Ninth Circuit affirmed the denial of the Tulalip's intervenor application on the grounds that "the calculus for tribal treaty rights under Ninth Circuit law is separate and distinct from that for federal acknowledgment." *Greene v. United States,* 996 F.2d 973, 976–77 (9th Cir.1993). Thus, the Ninth Circuit reasoned, Tulalip's interest in the recognition proceeding did not rise to intervenor status since "[e]ven if [the Samish] obtain federal tribal status, [they] would still have to confront the decisions in *Washington I* and *II* before they could claim fishing rights." *Id.*

On the merits, Judge Zilly held that the Samish had been denied due process in the recognition proceedings and vacated the decision denying recognition and remand-

---

**3.** Bruce Babbitt was later substituted for Manuel Lujan as Secretary of the Interior.

ed the recognition petition to the DOI for formal adjudication under the Administrate Procedure Act (APA). February 25, 1992 Order, 1992 WL 533059. The Ninth Circuit affirmed Judge Zilly's due process ruling, requiring an APA due process hearing for the Samish. *Greene v. Babbitt,* 64 F.3d 1266 (9th Cir.1995).

On remand, Administrative Law Judge (ALJ) David Torbett of the DOI Office of Hearings and Appeals conducted an APA due process hearing on the Samish's recognition proceeding. After an eight-day hearing, on August 31, 1995 Judge Torbett issued recommended findings of fact and conclusions of law in favor of Samish recognition.

In his recommended decision, ALJ Torbett found that the Samish met all seven mandatory criteria necessary for federal recognition as an Indian tribe. *See* 25 C.F.R. § 83.7 (1993). Reviewing ALJ Torbett's decision, the Assistant Secretary for Indian Affairs rejected some of his findings and conclusions, but ultimately ruled in favor of Samish recognition on November 8, 1995. The Samish appealed these rejections, and Judge Zilly reinstated the finding of fact and conclusions of law that had been rejected and affirmed the Samish recognition decision. *Greene v. Babbitt,* 943 F.Supp. 1278, 1288–89 (W.D.Wash. 1996).

Now, having achieved federal recognition, the Samish set out again,[4] pursuant to Rule 60(b)(6), to reopen the judgment in this case.

## II. DISCUSSION

### A. Rule 60(b)(6) Standards

■ Federal Rule of Civil Procedure 60(b) permits a court to relieve a party from an otherwise final judgment. Rule 60(b) states in relevant part: "On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons...." The Rule then identifies five specific provisions, for such things as mistake, discovery new evidence, fraud, etc., that could be grounds for relief under the Rule. Subsection (b)(6) acts as a "catch-all" provision, stating that a court may grant relief from a judgment if there is "any other reason justifying relief from the operation of the judgment." This provision applies only when there are reasons for relief other than those set out in the more specific clauses of Rule 60(b). *See Liljeberg v. Health Servs. Corp.,* 486 U.S. 847, 863 & n. 11, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988).

■ Rule 60(b)(6) "does not particularize the authority adequate to enable [courts] to vacate judgments whenever such action is appropriate to accomplish justice, [but it should] only be applied in extraordinary circumstances." *United States v. Washington,* 98 F.3d 1159, 1163 (9th Cir.1996) (internal citations and quotations omitted). The Ninth Circuit has cautioned that the Rule should be used "sparingly as an equitable remedy to prevent

---

**4.** An earlier, unrelated attempt to set aside the judgment in *Washington II* occurred on November 22, 1993, when three Tribes, including the Samish, moved for relief under Rule 60(b)(6) on the grounds that Judge Boldt might have been mentally incompetent at the time he signed the final findings in the case. This court, on January 23, 1995, denied the motion on three grounds: (1) that courts should avoid the finality of judgments; (2)

that a ruling for the Tribes would open the floodgates to future challenges to judgments on grounds of judicial incompetence; and (3) the Tribes suffered no manifest injustice since the magistrate judge and the Ninth Circuit reached the same conclusion as Judge Boldt. The Ninth Circuit affirmed this court's ruling. *United States v. Washington,* 98 F.3d 1159 (9th Cir.1996).

manifest injustice" and only "where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *Id.*

 Rule 60(b) is designed to allow courts to reconsider both factual findings and legal conclusions under the limited circumstances permitted by the Rule. Thus, even though the issue of the Tribe's treaty status has been previously litigated, this court is not barred from reconsidering *Washington II* were it to find the existence of circumstances under the Rule that warrant it.[5]

## B. Motion to Reopen

While numerous issues are raised in this matter, the court is of the opinion that there are two principal issues: (1) whether the Samish's federal recognition is an "extraordinary circumstance" that justifies reopening the judgment in *Washington II*; and (2) whether the interests in finality are paramount to other interests. Each is discussed below.

### 1. *"Extraordinary Circumstances"*

 The primary inquiry on any motion under Rule 60(b)(6) is whether there are "extraordinary circumstances" that warrant vacating the judgment. *United States v. Washington*, 98 F.3d at 1163.

Thus, the burden is on the Samish to show that their achievement of federal recognition constitutes an "extraordinary circumstance" in this context.

From the outset, the Samish face a significant burden because it has been well established that federal recognition does not necessarily restore Samish treaty rights. *See Washington I*, 520 F.2d at 692 ("Nonrecognition of the tribe by the federal government ... may result in loss of statutory benefits, but can have no impact vested treaty rights."). Indeed, the Ninth Circuit has been clear that it "regards the issues of tribal treaty status and federal acknowledgment as fundamentally different." *Greene*, 64 F.3d at 1270. The Ninth Circuit denied the Tulalip Tribe's attempt to intervene in the Samish recognition proceeding because it "disagreed with their position that Samish success [in the recognition proceeding] would undermine the finality of the *Washington II* decision." *Id.* at 1271. Put even more sharply, the Ninth Circuit has stated that "[f]ederal recognition is not a threshold condition a tribe must establish to [exercise treaty rights]" and that the Samish's recognition would have a "marginal influence at best" on the determination of whether the Tribe may exercise treaty rights. *Greene*, 996 F.2d at 976, 978. Thus, the Samish's posi-

---

**5.** The court is mindful of the fact that Judge Zilly, in the recognition litigation, ruled that the Samish were precluded by *Washington II* from litigating its treaty tribe status. <u>See</u> Order, 1992 WL 533059 at \*2. While Judge Zilly could not, in unrelated litigation, properly reconsider the findings and conclusions in *Washington II*, this court is not barred from such reconsideration if there are "extraordinary circumstances" within the meaning of Rule 60(b) that justify it. To hold otherwise would preclude Rule 60(b) motions, since the non-moving party could always plead *res judicata*.

A related issue, raised by the United States, is whether this court can properly consider the Samish's motion in light of the Ninth Circuit's decision affirming *Washington II*. This issue is easily resolved. In *Standard Oil Co. of Cal. v. United States*, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976), the Supreme Court stated that an appellate mandate "relates to the record and issues then before the court, and does not purport to deal with possible later events." <u>See also</u> 11 Wright, Miller & Kane, Federal Practice & Procedure § 2873 (1995) ("An appellate court may not know whether the requirements for reopening a case under the rule are met until there has been a full record developed. Such a record can only be made in the trial court.").

tion that federal recognition is an "extraordinary circumstance" in this case is seemingly at odds with the Ninth Circuit's pronouncements to the contrary.

Indeed, the kind of "extraordinary circumstances" usually alleged in Rule 60(b)(6) motions are not present here. That is, the Samish have not alleged that the *Washington II* proceeding was in any way inadequate or defective, precluding the Samish from adducing all evidence to support its claim to treaty fishing rights. The absence of such allegations is significant. The Samish have not identified, nor has the court's research revealed, an instance in which Rule 60(b)(6) was successfully invoked where there was no allegation or finding that the underlying proceeding had fundamental flaws. *Cf., e.g., Liljeberg,* 486 U.S. at 863, 108 S.Ct. 2194 (setting aside the judgment because the trial judge had a conflict of interest and failed to recuse himself); *Klapprott v. United States,* 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266 (1949) (setting aside denaturalization judgment because at the movant was unable to defend himself in the proceeding due to imprisonment); *Ervin v. Wilkinson,* 701 F.2d 59, 61–62 (7th Cir. 1983) ("Where the moving party has been prevented from presenting the merits of his case by the conduct of which he com-

plains, Rule 60(b) relief is most appropriate.").

The Samish argue, nonetheless, that the "nature and quality of [its] recognition" is the kind of circumstance that could warrant reexamining *Washington II* and that the evidence submitted during the recognition proceeding was "substantially different"—broader and more detailed—than the evidence it submitted in *Washington II.*[6] Samish contend that a "more detailed historical picture" emerged in the recognition proceeding and that, by meeting the standard for recognition, it also met the standard for exercise of treaty fishing rights under *Washington I.*[7]

■ None of these arguments is persuasive. Whatever the "nature and quality" of the Samish's recognition, the fact remains that, as discussed <u>supra</u>, a tribe's recognition, or nonrecognition, has no impact on whether it may exercise treaty rights. The standard for treaty rights and for tribal recognition, while similar, are not identical, with "each determination serv[ing] a different legal purpose and ha[ving] an independent legal effect." *Greene,* 996 F.2d at 976. To gain federal recognition, the Samish had to establish the requisite social cohesion and community, continuity of political authority and an-

---

6. The Samish also contend, relying on a phrase in a Finding of Fact in *Washington II,* that that decision was not intended to be the final word on its treaty status. *See Washington II,* 476 F.Supp. at 1111 ("[T]he Samish ... [are not] *at this time* a treaty tribe in the political sense within the meaning of [*Washington I*].") (emphasis added). The Samish believe that the phrase "at this time" suggests that, should the Tribe later achieve the requisite continuity and organization of treaty tribes, the court might reconsider its treaty status. This argument merits only a brief response. First, the phrase "at this time," at the very least, admits of another interpretation—namely, that, while the Tribe might

have at one time exhibited the attributes of a treaty tribe, it no longer did so. Second, the standard for exercise of treaty rights includes, *inter alia,* that a tribe "have *maintained* an organized tribal structure," which suggests that a break in that necessary structure forecloses a tribe's ability to meet the standard.

7. The Samish point out that they could not use the Treaty of Point Elliott in the recognition proceeding. That they nonetheless achieved recognition, the Samish contend, is a testament to the strength of the evidence, as treaties are the primary way of showing recognition.

cestry from a historic tribe.[8] *See* 25 C.F.R. §§ 83–1 thru 83.7(c). To assert fishing rights, the Samish must demonstrate that they descended from a treaty signatory and "have maintained an organized tribal structure." *Washington II*, 641 F.2d at 1372. Three different judicial bodies in *Washington II* considered the evidence the Samish submitted in that proceeding and concluded that the Tribe had not "clearly established the continuous informal cultural influence [that is] required." *Washington II*, 641 F.2d at 1373. Thus, the Samish cannot rightly argue that having met the recognition standard, it has, *a fortiori*, met the standard for asserting treaty rights.

Furthermore, the Samish are precluded from arguing, as they appear to, that the evidence it submitted in the recognition proceeding should persuade this court that *Washington II* was wrongly decided. If, as the Samish assert, the evidence it submitted in the recognition proceeding was different and more comprehensive, creating a more "detailed historical picture," such a fact does not entitle the Tribe to relief under Rule 60(b). First, such a claim would be properly brought pursuant

to Rule 60(b)(2), which requires that motions based on newly-discovered evidence be filed within one year of the judgment. Furthermore, in addition to the timeliness problem, it is not clear that the different evidence touted by the Samish was, in fact, "newly discovered" or that it could not have been produced during the *Washington II* proceeding. Cf. *Frederick S. Wyle P.C. v. Texaco Inc.*, 764 F.2d 604, 609 (9th Cir.1985) (stating that "movant is obliged to show not only that this evidence was newly discovered ... but also that it could not with reasonable diligence have discovered and produced such evidence at the hearing") (internal quotations omitted). There must be an end to litigation, and for that reason Rule 60(b) does not provide parties another chance at relitigating matters based on evidence gathered several years after a final judgment.

The court is mindful that the Samish's recognition decision was excessively delayed and that, had the Samish been recognized at the time it sought to intervene in *Washington II*, the outcome might have been different.[9] Such speculation, however, cannot be grounds for granting relief under Rule 60(b).[10] In any event, other

---

8. In announcing Samish federal recognition in 1996, the federal government found that the Samish met this standard:

> We find that the Samish Tribal Organization has been continuously identified through history as Indian or aboriginal, has existed as a distinct community since first sustained European contact, has maintained political influence within itself as an autonomous entity and that 80 percent of its members are descendants of the historical Samish tribe or families which became incorporated into that tribe. We conclude, therefore, that the Samish Tribal Organization has met the mandatory criteria for acknowledgment....

Samish Acknowledgment Decision, Ex. 8, 61 Fed.Reg. 15826.

9. Judge Zilly noted that the "Samish people's quest for federal recognition as an Indian

tribe has a protracted and tortured history, and their long journey for recognition has been made more difficult by excessive delays and governmental misconduct." *Greene*, 943 F.Supp. at 1281.

10. Nor can the Tribe rely on the fact that the United States has in the past qualified its opposition to Samish intervention on the grounds that future federal recognition might justify reconsideration. The Samish stress that their potential future recognition was stressed at all stages of *Washington II* because, they argue, it was relevant in allowing the court to deny treaty status at that time. The United States cannot dispute its previous statements regarding the potential effect of Samish recognition, but it asserts only that it agreed to consider whether recognition might justify reconsideration. Whether the United

Washington tribes, including the Stillaguamish and the Upper Skagit, exercise treaty fishing rights even though not federally recognized. *Washington I,* 520 F.2d at 692–93. Furthermore, while the Samish's non-recognition was dispositive to Judge Boldt in *Washington II,* the Ninth Circuit, after conducting its own review employing the proper standard, concluded that the Samish had not met the standard for exercising treaty rights.

In conclusion, the court finds for the foregoing reasons that the Samish's 1996 recognition is not an "extraordinary circumstance" that justifies reopening the judgment in *Washington II.*

### 2. *Finality concerns*

An equally compelling factor weighs against reopening the judgment in this case: the interest in finality.

The United States and the Opposition Tribes point out that, in reliance on *Washington II,* this court has approved many state-tribal fish management plans, mediated and decided intertribal disputes on treaty fishing issues, determined treaty tribes' usual and accustomed fishing places, and decided allocation issues. *See, e.g., United States v. Washington,* 626 F.Supp. 1405 (W.D.Wash.1985) (collecting court's finding and orders including, *inter alia,* 1985 Puget Sound Salmon Management Plan and agreements between the Tulalip Tribe and other Tribe). The Unit-

ed States and Opposition Tribes rightly observe that management of fish harvest involves a delicate balancing of interests within the overall framework and that these management plans—achieved after considerable time and expense—would be upset by the addition of another Tribe at this late stage.

The Samish, however, do not believe that granting the instant motion will "upset the fabric" of *United States v. Washington,* arguing that state tribal fish management plans and allocation decisions will suffer minimal disruption should the Samish ultimately be granted treaty status. The Samish's accommodating intentions notwithstanding, the background of this case shows that this assertion rings false. The parties have worked diligently and extensively over the many years this case has been active to establish management frameworks that accommodate the fiercely competing needs of the various tribes and of the State. The issues have been complicated by the increasing scarcity of fish stocks and the need to preserve and conserve certain fish species. This case over a 28–year period has proven to be a battleground where many of these issues have been fought and solutions hammered out. The Samish have not convincingly rebutted, nor could they, the unmistakable conclusion that, at this stage, their addition would wreak havoc on hard-wrought management agreements and plans.[11]

States agreed to reconsider its opposition to the Samish's treaty tribe status upon federal recognition is of little moment. Samish place great weight on these statements, but there are no comparable statements *from the court* in *Washington II* that recognition might justify reconsideration. To the contrary, the Ninth Circuit in *Washington II* specifically stated that "[n]onrecognition of the tribe ... [has] no impact on vested treaty rights." *See Washington I,* 520 F.2d at 692.

11. At oral argument, counsel for the United States pointed out that, in addition to the Samish, two of the other five Tribes that sought intervention in *Washington II* have attained federal recognition since that decision. Therefore, if the court were to grant the Samish intervention in *United States v. Washington,* it is likely that at least two other tribes would also move to reopen the judgment in *Washington II,* thereby potentially injecting further complications into the long-negotiated management plans in this case.

The Supreme Court has recognized that the interests of finality, as embodied in the policies of *stare decisis* and *res judicata,* are at their zenith in cases, such as this one, which involve natural resource allocation. *See Nevada v. United States,* 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) (rejecting attempt to reopen a water rights decree to accommodate new claims to water); *Arizona v. California,* 460 U.S. 605, 620, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (noting that major purpose of the case was "to provide the necessary assurance to states of the Southwest . . . of the amount of water they can anticipate to receive from the Colorado River system" and that "[r]ecalculating the amount of practicably irrigable acreable runs directly counter to strong interest in finality in this case"). Just as states in the West rely on the finality of water-rights agreements, so too do the 22 treaty tribes in this case, as well as the State of Washington, rely on the finality of fish-allocation and countless other agreements that have been entered in this case. In reliance on the finality of such agreements, the treaty tribes have invested significant time and capital to secure their take of what, for some, might be their only natural resource. Changes in allocation agreements (on which some tribes have relied for years) could have serious repercussions for already financially hard-pressed Tribes.

### III. CONCLUSION

▮ While the court recognizes that the Samish Tribe's quest for treaty fishing rights, beginning in the mid–1970s and concluding here, has taken them down a long and difficult path, and appreciates the commitment and perseverance demonstrated in this pursuit, there have been 28 years of post-*Washington I* litigation in this case, all under the assumption that *Washington II* was binding and conclusive. Reexamining the Samish intervention issue could require changing scores of orders and management plans in this case, thereby affecting the rights of 22 other treaty tribes as well as the United States and the State of Washington. Finality and certainty require that long-resolved issues in this case remain undisturbed.[12]

Now, therefore, the motion [docket no. 39–1] is hereby DENIED.

### ORDER DENYING THE SAMISH TRIBE'S MOTION FOR RECONSIDERATION

Subproceeding No. 01–2

(February 07, 2003)

Before the court is the Samish Indian Tribe's motion for reconsideration of the court's December 19, 2002 Order Denying the Tribe's Motion to Reopen. In that order, the court found that two factors weighed against the Samish's request to reopen the judgment in *United States v. Washington ("Washington II")*: first, that the Samish's 1996 federal recognition was not an "extraordinary circumstance" for purposes of Rule 60(b)(6), and, second, that the interests in finality were substantial given the numerous fish allocation and management agreements that would be

---

**12.** Having found that the Samish's recognition does not constitute an "extraordinary circumstance" and that finality concerns outweigh other considerations, the court need not consider the remaining issues, including whether the Samish's motion was filed within a reasonable period. Another issue of no import is the Samish's motion to strike, in which motion the Samish argue that the Opposition Tribe's brief was filed three days late. Assuming that the brief was filed late, the Samish have suffered no prejudice, having filed its reply brief, as provided by the agreed briefing schedule, thirty days after receipt of the Joint Opposition brief.

disrupted by the Samish's intervention. In the instant motion, the Samish ask the court to reconsider both conclusions.[1]

As to the first, the Samish contend that the court committed manifest error in ruling that the Tribe's recognition was not an "extraordinary circumstance" since, in the Tribe's paraphrase, "the Ninth Circuit clearly ruled that the Samish Tribe would be given a full and independent opportunity to litigate its treaty status if it obtained recognition." Mot. at 6. The Ninth Circuit never made such a ruling. In *Greene v. United States*, 996 F.2d 973 (9th Cir.1993), the Ninth Circuit concluded that the Tulalip Tribe could not intervene in the Samish's recognition proceeding because recognition did not implicate treaty rights. In response to the Tulalip Tribe's arguments, the Ninth Circuit acknowledged that the Samish, if recognized, might next seek to assert fishing rights, but the court concluded that, even so, the Tulalip's treaty interests were not "practically impaired" since recognition and treaty rights were unrelated. *Id.* at 978. The court never even suggested that the Samish would be entitled to reopen *Washington II* upon obtaining recognition. Any other construction of the Ninth Circuit's statements in *Greene* is untenable.[2]

The court's rulings regarding the effect of the Samish's recognition are not, or so it would appear, what truly prompted the instant motion. The primary focus of the Tribe's motion concerns whether the Tribe's intervention would in fact be unduly disruptive to the many management and allocation agreements in this case. The Samish assert that necessary information concerning such agreements was not forthcoming from other tribal parties, precluding the Samish from addressing the disruption concerns in settlement proposals. The Samish further state that at oral argument on the motion, counsel for the Tulalip Tribe revealed a "new fact"—namely, that all such agreements and orders are matters of public record. This statement, according to the Samish, contradicted previous representations by tribal counsel that the contents of such agreements were unavailable. Having now examined these agreements, the Samish submit a proposal that purports to "address all possible disruptions its participation in *U.S. v. Washington* might entail." Mot. at 3.

Notwithstanding the Samish's efforts to craft a workable, minimally disruptive framework for the Tribe's intervention, the court is unpersuaded that the interests in finality can or should be overcome in this case. Under any scenario, the Samish, in addition to the other newly recognized Tribes likely to seek intervention, would necessarily inject themselves into sensitive agreements and upset current treaty tribes' allocations. The Samish assert, however, that they are "initially" interested only in "ceremonial and subsistence treaty fishing rights" and that such an exercise of fishing rights would not "cause financial impacts to other tribes." Mot. at 4. But the Samish themselves admit they will likely want to engage in commercial

---

1. Because the court is not persuaded that it committed manifest error in its order, it has not asked for responsive briefing from the other parties.

2. It is worth mentioning, moreover, that none of the issues before the court on the Samish's motion to reopen—such as the requirements of Rule 60(b)(6) and the finality interests— were before the Ninth Circuit in *Greene*.

Therefore, whatever remarks the Ninth Circuit made about the prospect of the Samish returning to this forum should be construed warily. This is especially true in light of the Ninth Circuit's statement that Samish recognition "would have a marginal influence at best" on the Tribe's entitlement to fishing rights. *Greene*, 996 F.2d at 978.

fishing one day and that intra-tribal allocation disputes requiring court intervention might therefore arise. Mot. at 4–5. The court remains of the opinion that finality is an overriding concern in this case.

Such finality concerns, however, were not the sole or even the chief basis for denying the Tribe's motion to reopen. The court recognizes the effort the Samish have made to draft a practicable framework for intervention, but such efforts are futile unless the Tribe can demonstrate that, under Rule 60(b), it should be allowed to reopen the judgment. To focus on mitigating the effects of reopening a judgment, rather than on whether reopening a judgment is procedurally allowable, is to put the cart before the horse. In the earlier Order, the court noted the reasons that Rule 60(b)(6) could not be used to relieve the Samish of the final judgment in *Washington II*. Among those reasons is that, unlike in other instances in which Rule 60(b)(6) was successfully invoked, the Tribe has never challenged the fairness of the *Washington II* proceeding. During that proceeding, the Samish had a full and fair opportunity to prove its entitlement to fishing rights and failed to do so. In its motion to reopen, the Tribe never argued that there was a fundamental defect in that earlier proceeding, which defect constitutes an "extraordinary circumstance."

■ The court need not reiterate all of the bases for denying the Tribe's motion to reopen. It is enough to note, however, that, even putting aside the finality concerns that the Samish seek to allay in the instant motion, there are ample reasons to deny the Tribe another chance at litigating its treaty status. No less than three courts have decided the issue against the Samish. Rule 60(b) was not designed to allow parties numerous bites at the same

apple absent certain extraordinary circumstances not present in this case.

## CONCLUSION

For the foregoing reasons, the motion for reconsideration [docket no. 69–1] is hereby DENIED.

## ORDER DENYING EMERGENCY MOTION FOR CONTINUED MAINTENANCE OF STATUS QUO AND FOR 2003 MANAGEMENT PLAN

Subproceeding No. 91–1

(February 26, 2003)

■ Before the court is the Quileute Tribe's Emergency Motion for Continued Maintenance of Status Quo and for 2003 Managements Plan. This subproceeding involves the commercial halibut treaty fishery of twelve Indian Tribes. In this motion, the Quileute seek, pursuant to this court's March 20, 2001 Order, to enforce the *status quo* with respect to the upcoming tribal halibut fishery. The motion was prompted by indications that the Makah Tribe intended to conduct an unrestricted halibut fishery on March 1, 2003. This date, according to the Quileute, contravenes the *status quo*, which requires that the fishery not begin until March 15, 2003.

The treaty halibut fishery has largely been managed through a series of annual intertribal harvest management plans.[1] The parties have historically utilized three sub-fisheries to harvest halibut allocation. The first is a 48–hour "unrestricted opening," which imposes no limits on catch vessels. The second is a thirty-day "restricted opening," in which each vessel is allowed to land no more than 500 pounds of halibut per day. This sub-fishery has always begun at the same time as the unrestricted opening. Finally, there is a

---

1. A more complete background of this matter is set forth in the March 20, 2001 Order.

variable "mop-up" period, designed to exhaust the allocation, which takes place after the restricted fishery is completed.

The tribes have varying stakes in each sub-fishery because "fishing grounds are at diverse locations, and because the fishers' habits and capabilities vary." 2001 Order at 3. For similar reasons, whether the halibut fishing commences earlier or later in March can affect the tribes' allocation, as well as the market price for the halibut. The inclement weather more likely to occur earlier in March tends not to affect those, like the Makah, with larger fishing vessels. Conversely, tribes such as Quileute, who have smaller vessels, prefer later opening dates when the weather is better and conditions are, therefore, safer.

Inasmuch as the tribes have, to some degree, discordant interests, allocation and timing disputes have arisen in the past as the opening of the halibut fishery approached. On March 20, 2001, the court held that if the parties "wish to substantially change the *status quo* and cannot reach a consensus, the interested tribes should present the issues early enough to allow for a hearing and careful consideration by the court." Order at 8 n. 3. Thus, last-minute changes to the fishery management plans are not allowed.

Neither the Quileute nor the Makah believe that their proposed opening date constitutes a change to the management plan. The Quileute characterize the status quo as requiring that the tribes' halibut fishery open in mid-March, as it has in the last few years. The Makah, however, believe the *status quo* calls for commencing the halibut fishery on the date set by the

International Pacific Halibut Commission (IPHC).

It is clear that the opening of the coast-wide halibut fishery is determined by the IPHC, which, on January 27, 2003, announced a March 1, 2003 coast-wide opening date for treaty and non-treaty fishermen. The opening date for the halibut fishery chosen by IPHC has varied; the treaty tribe's adherence to that date has not. In the last few years, the opening date has been in mid-March. From 1988 through 1993, the opening date was March 1. None of the tribes has presented evidence that the opening of the commercial tribal halibut fishery has ever strayed from the date chosen by IPHC.

In arguing that March 15 should again be the opening date for the treaty tribes, the Quileute maintain that there has never been an agreement to make the opening date of the unrestricted sub-fishery coincide with the opening date established by the IPHC. This argument is unavailing. Whether by agreement or tradition, the opening of the unrestricted and restricted subfisheries has occurred on the date selected by the IPHC for the opening of the coast-wide fishery.[2] In fact, the Quileute themselves recognize that the tribes' halibut fishery has always begun on the date selected by the IPHC. See Quileute's Reply Br. at 2 ("The restricted fishery has *always* opened at the same time as the unrestricted fishery; and it has *always* opened on the first day fishing was allowed by the IPHC) (emphasis in original). In arguing for a mid-March opening date, the Quileute offer reasons that the March 1 date might disadvantage them. Such equitable factors, while undoubtedly of prime

---

**2.** Other treaty tribes (the Swinomish, Lummi, and the Tulalip Tribes) have submitted pleadings confirming that the selection of the halibut fishery opening has traditionally coincided with the date selected by the IPHC. To the

extent there is no formal agreement to tie the tribes' opening to the date selected by the IPHC, the tribes may choose to address that issue with or without the court's assistance.

concern to the Quileute, cannot alter the guiding principle in this case—namely, that the status quo not be altered absent a proper adjudication by the court. Maintaining the *status quo* for present purposes requires that the unrestricted and restricted fishery commence on the date selected by the IPHC, which, this year, is March 1, 2003.[3]

## CONCLUSION

For the foregoing reasons, the Quileute Tribe's Emergency Motion for Continued Maintenance of Status Quo and for 2003 Management Plan [docket no. 89–1] is DENIED.

## ORDER DENYING MOTION TO STRIKE

Subproceeding No. 01–2

(March 13, 2003)

Before the court is the plaintiff Tribes' motion to strike certain portions of the Samish Motion for Reconsideration, which motion requested that the court reconsider its December 19, 2002 Order denying the

Samish Tribe's motion to reopen.[1] On February 7, 2003 the court denied the Samish's motion for reconsideration. In this motion, the plaintiff Tribes, joined by the State of Washington and the United States, ask the court to strike those portions of the Samish's reconsideration motion referencing statements and events at the Meet and Confer meeting of March 8, 2002, and the inclusion of a "settlement" proposal contained in pages 4 and 5 of the Samish's motion. The Samish oppose the motion to strike, arguing that neither its reference to statements at the settlement conference nor its proposal was improper under Federal Rule of Evidence 408.[2]

■ In its motion for reconsideration, the Samish Tribe referenced statements made by counsel for the Tulalip Tribes at the Meet and Confer meeting, arguing that those statements were inconsistent with counsel's statement at oral argument on the Samish's Rule 60(b)(6) motion. In referencing those statements, the Samish intended to show that, prior to the court's adjudication of their motion to reopen,

3. The *status quo* is also maintained by opening both the unrestricted and restricted fisheries at the same time. Inasmuch as there is no consensus on the Makah's proposal to open the restricted fishery on March 15, 2003, the court is of the opinion that the tribes should not stray from the traditional opening b: both the restricted and unrestricted fishery on the same date.

1. The motion to strike was submitted by the Tulalip Tribe, the Lummi Indian Nation, the Swinomish Tribal Community, the Upper Skagit Indian Tribe, the Suquamish Tribe, the Pt. Gamble, Lower Elwha, Jamestown S'Klallam and the Skokomish Indian Tribe, and the Puyallup Tribe. In this order, the court refers to these Tribes alternately as the "opposition Tribes" and the "plaintiff Tribes." In relation to the Samish's motion to reopen, these Tribes are "opposition Tribes," but in the overall context of the *United States v. Washington,* these are "plaintiff Tribes."

2. The Samish contend that the plaintiff Tribes inexcusably delayed filing the motion. In light of the practical necessities of this case, the court disagrees. Given the timing of the court's request to the Tribes to consider the Samish's proposal, and the number of Tribes involved, the court is of the opinion that there is nothing improper about timing of this motion

The court also briefly notes that, while Local Rule 7(g) provides that requests to strike should not be presented in a separate motion but should be included in the responsive brief, there was no responsive brief in this case. The court did not ask for a responsive brief on the Samish's motion for reconsideration. Thus, under these circumstances, the opposition Tribes argues, and the court agrees, that a separate motion to strike is appropriate.

they were under the false impression that the management plans in this case were not part of the public record. According to the Samish, they could not, therefore, make specific proposals to mitigate the disruption concerns raised by the court.[3] The plaintiff Tribes now argue that the Samish's reference to these statements is in violation of Federal Rule of Evidence 408, which provides that "[e]vidence of conduct or statements made in compromise negotiations is ... not admissible."

The plaintiff Tribes' argument misses the mark. As the Tribes themselves recognize, "the Rule applies to disclosure of conduct that reveals the details of the settlement negotiations ... [and] not to conduct that does not bear on the dispute." Reply at 5 n. 4. The statements at issue have no bearing on the substance of the settlement negotiations and are, to that extent, not within the ambit of Rule 408. The court therefore declines to strike these statements from the Samish's motion.

■ Next, the plaintiff Tribes argue that the Samish's proposal to minimize the disruption concerns, put forth in the body of their motion for reconsideration, is also an improper submission of settlement matters. In that proposal, the Samish propose, *inter alia,* that they would agree to exercising treaty rights of the Lummi, Swinomish and Upper Skagit Tribes under existing orders applicable to those Tribes. The Samish further state that they would limit the exercise of those rights, at least initially, to ceremonial and subsistence purposes.

The Samish believe their proposal has now become characterized as a settlement proposal (partly as a result of the court's request to the opposition Tribes), which was not their intention. Instead, the proposal was, according to the Samish, intended to show the court that a workable framework could be drafted to minimize the disruption caused by their intervention.

The court finds nothing improper about the submission of this proposal. It is clear that the Samish did not advance this proposal for settlement purposes but to address the court's concern regarding the potential for disruption to the management plans caused by the Samish's intervention. That the proposal took on the nature of a settlement proposal is no doubt due in part to the court's request to the opposition Tribes to consider whether the proposal addressed any of their concerns. In sum, the court finds that the proposal was properly submitted and that there is no basis to strike it from the record.

### CONCLUSION

For the foregoing reasons, the motion to strike [docket no. 76–1] is hereby DENIED.

### ORDER DENYING THE STATE OF WASHINGTON'S MOTION FOR A PRELIMINARY INJUNCTION

Subproceeding 03–1

(April 02, 2003)

■ Before the court is the State of Washington's (the "State") motion for a preliminary injunction, requesting that the Hoh Tribe's fishery targeting wild steelhead close after 10:00 a.m. on March 25,

---

3. While the potential for disruption to these plans was and is a consideration in assessing the practicality of Samish intervention, the court, as set forth in both its orders dated December 19, 2002 and February 7, 2003, found far more persuasive the fact that the Samish had not come forward with an "extraordinary circumstance" that warranted reopening the judgment in this case under Rule 60(b)(6).

2003.[1] The Hoh Tribe oppose the motion, arguing that, if it closes its steelhead fishery at that time, the Tribe will be prevented from taking its 50% share of the steelhead run.

The Hoh Tribe started its winter steelhead fishery on December 2, 2002 and plans to complete its fishery on April 2, 2002. The non-treaty fishery began on December 1, 2002 and is planned to continue until April 15, 2002.

The State and Hoh Tribe met several times over the last few months to discuss technical as well as allocation issues with respect to the winter steelhead fishery. The parties successfully reached agreement regarding the technical issues of run-size and appropriate escapement numbers. The parties agreed for this year that the expected Hoh River run size is 8,350 steelhead, comprised of 5,310 wild and 3,040 hatchery steelhead. The escapement goal for the wild steelhead was set at 2,400. In total, 5,950 steelhead are available for harvest from the winter run, which breaks down to 2,975 steelhead each for the treaty and non-treaty fisheries. The Hoh Tribe's proposed fishing schedule estimated a yield of 3,002 steelhead, which is approximately a 50% share of the winter steelhead run.

In this motion, the State does not assert that the Hoh Tribe will exceed its share of the combined stocks of wild and hatchery-bred fish that comprise the harvestable winter steelhead run. Instead, the State contends that the Hoh's fishery plan will result in the Tribe's taking more than its 50% share of the *wild* steelhead component of the fishery. Thus, the instant dispute is whether, when allocating shares of harvestable steelhead, hatchery and wild shares are to be aggregated and considered together or whether, as the State argues, the two components are considered separately, in which case the State is entitled to a 50% share of the wild component. As noted above, there is no dispute about whether the Tribe's overall allocation of steelhead will be approximately 50%. Indeed, the State admits that, "[i]f the Court [does] approve grouping the two runs together, the State's argument about fair allocation would obviously be moot." Reply Br. at 2.

On such a limited record and shortened time, the court is not prepared to make a finding of fact as to whether steelhead should be considered separately or together for allocation purposes. As the State points out, the allocation of treaty and non-treaty shares is based upon forecasts of particular "runs" of fish, which the court has defined as "[a] group of anadromous fish on its return migration, identified by species, race and water of origin." *United States v. Washington,* 384 F.Supp. 312, 405 (W.D.Wash.1974). There appears to be some question about whether hatchery and wild steelhead should be considered part of the same "run."

While the State argues that the historical practice has always been to treat the two components separately, the historical evidence appears inconclusive. The biologists for the Tribe and the State differ on whether the hatchery and wild steelhead have historically been separately allocated. Cf. 2d Freymond Decl. ¶ 4 (State's fish biologist) ("The Hoh Tribe and [the State] have historically managed hatchery and wild steelhead as two distinct runs."); with Jorgensen Decl., ¶ 10 (Tribe's biologist) ("Steelhead are managed separately for

**1.** The parties brought this dispute to the court only days before March 25, 2003, the date the State requests the Hoh Tribe stop its steelhead fishery. Because of time constraints, the court, on March 25, 2003, held a telephonic hearing with the parties and gave an oral ruling, denying the motion for a preliminary injunction. This written Order follows.

wild and hatchery components to ensure that the wild escapement is reached, but that has no effect on achieving allocation of the steelhead run."); and Grayum Decl. ¶ 3 (Director of Fishery Services for the Northwest Indian Fisheries Commission) ("As a general rule, treaty/non-treaty allocation is computed on a species by species and river by river basis . . . With an allocation unit, wild and hatchery fish are not allocated separately unless there is an agreement to do otherwise.").[2]

Therefore, inasmuch as the present record is inconclusive, the court is of the opinion that the State has not carried its burden to show that an injunction should issue and thereby alter the *status quo.* Indeed, at least two factors weigh against issuing the requested relief. First, it appears that, on at least some occasions in the past, the State and tribal fishery managers have agreed to a separate allocation for hatchery and wild steelhead. It is undisputed, however, that there was no such agreement this year, and none of the previous allocation agreements are binding on this winter's steelhead fishery.

Second, the evidence suggests that there will be no harm to future harvests from allowing the Hoh to continue its fishery. Even if the Tribe completes its fishing season, there will be an excess escapement of approximately 369 wild steelhead (beyond the 2400 goal). Thus, even if the Hoh continue its fishery schedule, the escapement goals for wild steelhead will nonetheless have been exceeded.

## CONCLUSION

Assuming the allocation issue raised in the State's motion has not already been resolved in prior Orders, that issue requires consideration of factors that have yet to be fully presented to the court. Inasmuch as this allocation issue is capable of repetition, it therefore remains ripe for consideration. Thus, as stated in the March 25, 2003 telephonic hearing, unless the parties are able to resolve the issue themselves, they must agree on a schedule for bringing the issue to the court for full and proper consideration. Such schedule should be filed with the court no later than April 4, 2003.

For the foregoing reasons, the State's motion for a preliminary injunction [doc. no. 1–1] is DENIED.

## ORDER ON MOTION FOR A TEMPORARY RESTRAINING ORDER

Subproceeding No. 89–3

(October 10, 2003)

RICARDO S. MARTINEZ, United States Magistrate Judge.

This matter is before the Court for consideration of a Temporary Restraining Order (TRO), under authority conferred by the Stipulation and Order Amending Shellfish Implementation Plan ¶ 9.1 (April 8, 2002). Three tribes, namely the Tulalip Tribes, the Swinomish Indian Tribal Community, and the Upper Skagit Indian Tribe ("Tribes") seek a Court order enjoining the Suquamish Tribe from engaging in crab fishing in Puget Sound Crustacean Management Region 2E during the current season, which began October 1, 2003. Oral argument was heard on October 9, 2003, and the Court now finds and rules as set forth below. The parties are familiar

---

**2.** By way of comparison, the Director of the Quileute Department of Natural Resources for the Quileute Tribe has submitted a declaration stating that the "current 2002–2003 Quillayute River Steelhead Management Agreement between the State and Tribe prescribes that the division of harvestable fish between the parties shall be based on the combined total hatchery plus wild harvestable fish." Moon Decl. ¶ 3.

with the factual and legal background of this dispute, so only a brief summary of facts relevant to the current situation will be given. Citations to the documents shall reference the pages as numbered in the movants' exhibits unless otherwise specified.

(1) Pursuant to the amended Shellfish Implementation Plan entered in this case April 8, 2002, the State and tribes have created a Puget Sound Dungeness Crab Management Agreement, in order to "ensure that treaty Indian and State fishers ... shall be accorded the opportunity to harvest their shares of shellfish as determined by the court in this case." Ex. 33. The Puget Sound Dungeness crab population is a limited, and dwindling, resource, and it is in the best interests of both tribal and non-tribal fishermen, as well as the general public, to ensure that it is managed properly to "preserve, protect, and ORDER ON MOTION FOR A TRO–1 perpetuate the ... resource." Ex. 34. Many tribes beyond those represented here are potential signatories to this agreement. Ex. 49–51.[1] Specific harvest plans are negotiated for each region; the one at issue here controls Region 2E. A harvest management plan for Region 2E for the period from April 1, 2003 through March 31, 2004 ("Plan") was circulated among the State and five named tribes, the Lummi[2], the Suquamish, the Swinomish, the Tulalip, and the Upper Skagit. Ex. 65. The Plan allocates a total of 850,000 pounds of crab to the tribal fishery, with the quota for the summer season (April 1 through September 30) being 650,000, and the remaining 200,000 pounds allocated to the winter fishery beginning October 1,

2003. Ex. 62. The 2E plan was signed on behalf of the Tulalip Tribes on April 29, 2003; the Swinomish Tribal Community on May 4, 2003; and the Suquamish Tribe on September 28, 2003. Ex. 65, 66, 67. The Suquamish did not participate in the summer crab fishery in Region 2E.

(2) The final level of management for Region 2E is an Intertribal Harvest Sharing Agreement. Ex. 68. This agreement was negotiated among the three Tribes, movants here, for the 2003 summer crab season. The Suquamish tribe is not a party to this agreement. By its own express terms, it was in effect only until the beginning of the non-treaty winter commercial fishery, and no later than October 1, 2003.

(3) On September 30, 2003, the Suquamish tribe issued regulations opening crab harvesting in crab management areas within Region 2E to Suquamish crab fishers. Ex. 86–87. The Tribes now seek a TRO enjoining Suquamish from exercising their tribal fishing rights in Region 2E because they have not complied with the Crab Management Agreement, the 2E Plan, or the Intertribal Harvest Sharing Agreement. Specifically, they assert,

> Recent actions by Suquamish to issue crab fishing regulations in Region 2E are in contravention of the Implementation Order, State and tribal plans, and the Shellfish Stipulation. They threaten to undermine the balance struck in favor of maintaining the status quo for tribal fishing. Absent intervention by this Court, the court formulated plan for cooperation and orderly fisheries will be violated and the ability of the Tribes to

---

1. The copy provided to the Court does not bear any actual signatures but that of the Washington Department of Fish and Wildlife.

2. The Lummi tribe is not a party to these proceedings. At the hearing, the Court granted Lummi counsel's oral motion to strike all references to actions taken by the Lummi tribe in the motion for a TRO and accompanying declaration.

ensure adequate harvest and conservation of shellfish in these areas for their fishermen will be irreparably harmed. Motion for TRO, p. 6. Although the motion was brought under F.R.Civ. Proc. 65(b)(1), notice and a hearing were provided to the parties, so it shall be treated as one under F.R. Civ. Proc. 65(a).

(4) The parties agree that the standard for obtaining a TRO, as for a preliminary injunction, is well-settled: To obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits together with the possibility of irreparable harm, or (2) that serious questions are raised, and the balance of hardships tips sharply in favor of the moving party. *Rucker v. Davis*, 237 F.3d 1113, 1117 (9th Cir.2001).

 (5) The movant Tribes have not met either prong of this test. First, they have failed to show a threat of irreparable harm. Counsel for the Tribes represented at the hearing that of the original 192,000 pounds of crab allocated to the winter fishery, only 60,000 remain uncaught. Eighty boats from the Tribes are eligible to fish for the remaining crabs; the addition of eight Suquamish boats will not affect the catch per boat in any significant way. Nor will the resource suffer any adverse impact; the total amount of crab to be harvested has already been determined and remains the same, no matter how many tribes participate in the catch. As for the probability of success on the merits, the Court is not persuaded by the Tribes' arguments that the Suquamish are seeking to seriously alter the status quo by

fishing in Region 2E. The Tribes assert that the Suquamish have never fished for crab in the waters of Regions 2E. TRO motion, p. 5. The Suquamish, in response, state that they did fish for crab throughout Region 2 prior to the year 2000, when it was divided into 2E and 2W. Declaration of Robert Purser. Since that time, each time Suquamish sought to issue regulations to open crab fishing in Region 2E, the Tulalip Tribes would threaten to initiate a suit to adjudicate their primary rights to that region. Id. Therefore, Suquamish did not attempt to assert their rights, until this winter season.[3]

(6) As to the second prong of the test, the Court finds that serious questions would be raised by a tribe's circumvention of the orderly process set forth in the plans and agreements. However, while Suquamish's actions may not have been in compliance with the spirit of the harvest management plan, neither were they technically in violation. As there is no actual requirement as to when the harvest management plan was to be signed, the Suquamish signature on September 28, 2003, constituted their agreement to abide by the terms of the 2E plan, and entitled them to issue regulations to fish for crab in the winter season. The Tribes' argument that Suquamish failed to participate in negotiating with the State on the Crab Harvest Management Plan for region 2E is not persuasive. The Plan, as adopted, bears a signature line for the Suquamish tribe, and clearly contemplates their participation. Ex. 65. The Suquamish state that, while

---

**3.** The Court notes that this proceeding is not the place to adjudicate primary rights. However, to the extent that it is relevant to the current dispute, the Court notes that Judge Boldt defined the Suquamish "usual and accustomed" fishing places as "the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion and also Hood Canal." *U.S. v. Washington*, 459 F.Supp. 1020, 1049 (W.D.Wash.1978). The Court finds this to mean all marine waters of Puget Sound, not just the western side as movants argue.

they did not attend meetings, they did review drafts of the 2E Plan, and discussed it with other tribes. Declaration of Robert Purser. No explanation was offered at the hearing on the motion as to why the Suquamish did not attend meetings, but a passing reference by tribal counsel to a "hostile environment" is cause for some concern. As to the intertribal harvest sharing agreement, there were conflicting statements at the hearing as to whether the Suquamish tribe was even invited to participate.[4] However, since this agreement is no longer in force as of October 1, 2003, it is not necessary for the Court to consider it further.

Although no formal testimony was taken at the hearing, it appears from the representations of counsel that both sides have participated to some degree in the breakdown of communication and cooperation that brought them to Court. Thus, it cannot be said that the balance of hardship tips sharply in favor of either party.

(7) Accordingly, the Tribes' motion for a TRO or preliminary injunction is DENIED.

## ORDER ON MOTION FOR RECONSIDERATION

Subproceeding No. 89–3

(November 24, 2003)

The Court, having considered the Tulalip Tribes and Swinomish Tribal Community's Motion for Reconsideration, together with the supporting and opposing memoranda, does now find and ORDER:

 On October 27, 2003, the Tulalip Tribes and Swinomish Tribal Community ("Movants") filed a motion for reconsideration, asking the Court to reconsider its October 10, 2003 Order denying Movants' motion for a TRO. Movants contend that reconsideration is required because the Court either overlooked or misapprehended certain facts and issues, as described below. Movants also assert that the Court erred in applying the traditional TRO standards. However, the motion was clearly designated and noted as a motion for a temporary restraining order, and was properly treated as such by the Court.

Movants assert that irreparable harm will ensue if the Court does not enforce the Revised Shellfish Implementation Plan, specifically ¶¶ 14.6 to 4.9 regarding opening a disputed fishery. However, the Court's ruling denying the TRO was based on a finding that ¶ 4.6 does not apply, because this is not a disputed fishery that "has been closed or adjusted pursuant to section 4.2 or 4.3." Motion for TRO, Ex. 14. It is, instead, a fishery opened by agreement under ¶ 4.5, as stated in the Puget Sound Dungeness Crab Management Agreement. Motion for TRO, Ex. 14, 33. Movants also argue that the Suquamish are in violation of that Agreement, because, they contend, it requires that "a tribe cannot commence fishing ... until they have signed this Agreement and jointly developed [a] regional management plan." Motion for Reconsideration, p. 5. However, as Movants later acknowledged in their reply memorandum, this is not the language of the Agreement. Instead, it states that no tribe may commence fishing "until they have signed **this Agreement and a jointly developed** regional management plan." Motion for TRO, Ex. 36,

---

4. The Court notes that the 1998 Dungeness Crab Management Agreement between the State and all the tribes appointed the Tulalip Tribes as the entity responsible for "coordination and communications concerning all Trib-al fisheries" in Region 2. Ex. 38. This designation imposes upon the Tulalip Tribes a heightened responsibility to maintain open communication and cooperation.

While this language does imply that the Agreement contemplates joint development of a management plan, it does not absolutely require the active participation of all signatories in that development. Therefore the Suquamish, in signing the Region 2 East Harvest Plan on September 28, 2003, were not in violation of this provision of the Crab Management Agreement, and Movants are not entitled to a TRO based on the alleged violation.

Next, Movants contend that allowing the Suquamish to fish for crab in Region 2E will upset the status quo, because the Suquamish have never before fished for crab in Region 2E. The Suquamish, while conceding that they have not fished for crab in Region 2E since its creation in 2000, explain that every time they have issued regulations seeking to open a fishery there, they have been threatened with a lawsuit. Declaration of Robert Purser re: Opposition to Motion for TRO. Nowhere have Movants addressed this allegation. In the absence of a countervailing explanation, the court declines to uphold a status quo that, according to the Suquamish, has been created and maintained by intimidation. Although Movants have alluded to an agreement between the parties that the purpose of the Region 2 division into 2 East (2E) and 2 West (2W) was to give the Suquamish exclusive fishing rights in Region 2W, and the Movants exclusive rights in 2E, they have not provided any proof of such agreement, either formal or informal.

Movants also object on the basis that these proceedings do not constitute an adjudication of primary rights in Region 2E. To the extent that footnote 3 in the court's Order could be construed as such a finding, Movants' request to strike the footnote is GRANTED. The balance of the motion for reconsideration is DENIED. However, although Movants have not met the standards for granting a TRO, the Court is concerned that the underlying issues in this matter have not been resolved, and may arise again. Therefore, the Court acknowledges Movants' alternative request for an "appropriate remedy" through the dispute resolution procedures set forth in ¶ 9.2 of the Revised Shellfish Implementation Plan. Counsel shall contact the courtroom deputy for Magistrate Judge Martinez, either Lowell Williams or Laurie Cuaresma, at 553–7416 to schedule a conference at the earliest possible date.